# PACIFIC STEAM WHALING COMPANY *v.* UNITED STATES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF ALASKA.

No. 26.  Argued December 8, 1902.—Decided January 5, 1903.

Where an applicant files with the District Court of Alaska a petition for a license for vessels and salmon canneries under section 460 of the act of 1899 providing a criminal code for Alaska, 30 Stat. 1253, 1336, and with it a protest against being required to take out or pay for such license on various grounds stated therein, to which petition and protest the clerk of the District Court is not made a party—although the papers may have been served on the district attorney—and the District Court thereafter makes an order granting the license, stating therein that so far as the protestant seeks relief against the payment of the licenses "the same is overruled, denied and ignored," an appeal to this court will not lie as there is no action, suit, or case, within the constitutional provision (Article III, section 2) in which was entered a final judgment or decree such as entitled the petitioner to appeal to this court.

Section 460 of the act of March 3, 1899, 30 Stat. 1253, 1336, entitled "An act to define and punish crimes in the District of Alaska and to provide a code of criminal procedure for said district," reads:

"That any person or persons, corporation or company prosecuting or attempting to prosecute any of the following lines of business within the District of Alaska shall first apply for and obtain license so to do from a District Court or a subdivision thereof in said district, and pay for said license for the respective lines of business and trade as follows, to wit:"

Then follows a list of forty-two callings and occupations, among which, applicable to the present case are the following:

"Fisheries: Salmon canneries, four cents per case; salmon salteries, ten cents per barrel; fish-oil works, ten cents per barrel; fertilizer works, twenty cents per ton.

\* \* \* \* \* \* \* \*

"Ships and shipping: Ocean and coastwise vessels doing local business for hire plying in Alaskan waters, one dollar per ton per annum, on net tonnage, custom-house measurement of each vessel."

Section 461 makes it a misdemeanor to engage in any of the occupations referred to without first obtaining a license. Section 463 reads:

"That the licenses provided for in this act shall be issued by the clerk of the District Court or any subdivision thereof, in compliance with the order of the court or judge thereof duly made and entered; and the clerk of the court shall keep a full record of all applications for license and of all recommendations for and remonstrances against the granting of licenses and of the action of the court thereon. *The clerk of the court shall be entitled to receive from each applicant for a license a fee of five dollars, and no other or additional compensation shall be paid such clerk for his services in connection with such license or the issue thereof: *And provided*, That the clerk of said court and each division thereof shall give bond or bonds in such amount as the Secretary of the Treasury may require and in such form as the Attorney General may approve, and all moneys received for licenses by him or them under this act shall be covered into the Treasury of the United States, under such rules and regulations as the Secretary of the Treasury may prescribe."

On July 6, 1899, the Pacific Steam Whaling Company filed

in the District Court of the United States for the District of Alaska a petition entitled:

"In the matter of the application of the Pacific Steam Whaling Company for a license for the steamship Wolcott, the steamship Excelsior, the steamship Newport, and the steamer Golden Gate, and canneries, and protest thereon."

It alleged that the petitioner was the owner of the steamships Wolcott, Excelsior, Newport and Golden Gate, engaged in doing a local business for hire in Alaskan waters, and was also engaged in the business of carrying on salmon canneries at certain named points in the district. It denied that it was subject to any license for the prosecution of either business, notwithstanding the provisions of the statute referred to; that in view of the stringent penalties provided in that statute for carrying on business without the required license it made the following protest: That the steamships were taxed as its property in the Port of San Francisco, California, of which State the petitioner was a corporation, and was therefore not subject to a license tax in the District of Alaska; that a license fee at the rate of $1 per ton, together with the tax charged in California against the petitioner, made a double tax, and was unreasonable, exorbitant, oppressive and amounted to the taking of petitioner's property without due process of law; that the title of the act under which this license section was found had no reference to the granting of a license for the prosecution of a lawful business, and the provisions of the act, so far as they purport to require the payment of license fees, are vague, unintelligible and doubtful, so that it cannot be reasonably inferred that Congress intended to require their payment, and that sections 460 and 461 of the act were contrary to the provisions of sections 8 and 9 of Article I of the Constitution of the United States, and therefore null and void. The prayer of the petitioner was as follows:

"1. That the said court first try and determine the matter as to whether or not it is necessary for the said petitioner to pay into court any license or sum of money whatsoever as provided under said act.

"2. That if said court shall determine that your petitioner

with respect to said steamships Wolcott, Excelsior, Newport and Golden Gate should first pay the said license fee required under said act in your court, before the trial and determination of said cause and matters herein set out, that the same be held by the clerk until the trial and determination of the matters and facts set forth herein.

" 3. That if the court determines that a license in the meantime should be granted to the said steamships, or either of them, as ocean and coastwise vessels, and doing local business for hire, plying in Alaskan waters, that such license be so granted and said money so held by the clerk of the court under protest as aforesaid, subject to the further action of this honorable court."

This petition was verified by the oath of the attorney of the petitioner. A copy of the petition was served upon the United States district attorney for the District of Alaska, the amount of the license fees was deposited with the clerk of the court, and a final order entered on January 2, 1900, which directed the clerk to issue the license and turn the money deposited into the Treasury of the United States, adding: " So far as said protestants seek relief against the payment of a license on the several businesses therein described, the same is overruled, denied and ignored in each case of protest." An appeal was allowed by the district judge and a transcript of the record filed in this court on August 15, 1900.

*Mr. S. M. Stockslager* for appellant. *Mr. W. W. Dudley, Mr. L. T. Michener, Mr. J. F. Malony, Mr. J. H. Cobb, Mr. George C. Heard, Mr. John R. Wynne* and *Mr. John G. Heid* were on the briefs.

*Mr. Solicitor General Richards* for the United States. *Mr. Assistant Attorney General Beck* was with him on the brief.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

The proceeding in this case is a novel one, and the first ques-

tion is whether there was any action or suit—any case within the constitutional provision, Article III, sec. 2, extending the judicial power of the United States "to all cases, in law and equity, arising under this Constitution"—in which was entered a final judgment or decree such as entitled the petitioner to an appeal. "A case is a suit in law or equity, instituted according to the regular course of judicial proceedings; and when it involves any question arising under the Constitution, laws or treaties of the United States, it is within the judicial power confided to the Union." 2 Story on the Constitution, sec. 1646; *Osborn* v. *United States Bank,* 9 Wheat. 738, 819. Here a petition was filed, which was in form an application for a license, with a protest that the petitioner ought not to be compelled to take one out. The application was granted, and the petitioner could certainly not appeal from an order granting that which he asked for. The application, it is true, was coupled with a protest, but who ever heard of an appeal being sustained from a protest? There was no suit against the clerk to restrain him from receiving the license money. He was not made a party, entered no appearance, and no decree was rendered for or against him.

The power to grant licenses was by the statute vested in the District Court, or a judge thereof. Giving an interpretation to the petition the most favorable to the petitioner, it was an application to a tribunal having judicial functions to restrain itself from the discharge of administrative duties. It is contended that the nature of the proceeding is not changed by uniting judicial functions and administrative duties in the same tribunal; that it is the same as though such functions and duties were exercised by different bodies or officers, and that it is to be treated as though it was an application to a judicial tribunal to restrain a different and administrative officer from the discharge of administrative duties. Congress, it is said, cannot by imposing both sets of duties upon the same tribunal deprive a party of a right which he would have if those duties were entrusted to different officials. If we are justified in giving this interpretation to the proceeding we meet the familiar doctrine that an injunction will not lie to

restrain the collection of a tax on the mere ground of its illegality. *Dows* v. *City of Chicago*, 11 Wall. 108 ; *Hannewinkle* v. *Georgetown*, 15 Wall. 547 ; *State Railroad Tax Cases*, 92 U. S. 575 ; *Milwaukee* v. *Kœffler*, 116 U. S. 219. And this is true whether these taxes are local or general, or, if general, whether internal revenue or direct taxes. Indeed, in respect to internal revenue taxes, section 3224, Revised Statutes, specifically provides : " No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." Something more than mere illegality is necessary to justify the interference of a court of equity. But it does not appear that the tax if unpaid would cast a cloud upon the title to any real estate, or work irreparable injury. While it may be that the failure to pay the tax would expose the petitioner to a multiplicity of prosecutions for misdemeanor, yet neither the District Court, nor the judge, nor the clerk initiates criminal proceedings, and the district attorney—the prosecuting officer—was not made a party to the suit. True, an order was entered that he be notified of the pendency of the application and he appeared as *amicus curiæ.* Even had he been made a party, would equity entertain a bill to restrain criminal prosecutions ? *In re Sawyer*, 124 U. S. 200 ; *Harkrader* v. *Wadley*, 172 U. S. 148 ; *Fitts* v. *McGhee*, 172 U. S. 516.

It is said that unless this application can be sustained the petitioner is without remedy, and that there is no wrong without a remedy. While as a general statement this may be true, it does not follow that it is without exceptions, and especially does it not follow that such remedy must always be obtainable in the courts. Indeed, as the government cannot be sued without its consent, it may happen that the only remedy a party has for a wrong done by one of its officers is an application to the sense of justice of the legislative department. Still we must not be understood as deciding that the only remedy in this case was an appeal to Congress. It was held in *Elliott* v. *Swartwout*, 10 Pet. 137, 156, that, under the law as it stood at that time, Congress having made no special provision, where a collector had charged excessive duties, and the party paying them, in order to get possession of his goods, accompanied the

payment by a declaration to the collector that he intended to sue him to recover back the amount erroneously paid and by a notice not to pay it over to the Treasury, an action could be maintained against the collector for the excessive charge.   The court said that the question as to the right to recover must be answered in the affirmative, " unless the broad proposition can be maintained, that no action will lie against a collector to recover back an excess of duties paid him; but that recourse must be had to the government for redress.   Such a principle would be carrying an exemption to a public officer beyond any protection, sanctioned by any principles of law or sound public policy."   See also *Cary* v. *Curtis*, 3 How. 236; *Curtis' Administratrix* v. *Fiedler*, 2 Black, 461.   In *Erskine* v. *Van Arsdale*, 15 Wall. 75, a case of internal revenue taxes, it was said by Chief Justice Chase (p. 77): " Taxes illegally assessed and paid may always be recovered back, if the collector understands from the payer that the taxes are regarded as illegal and that suit will be instituted to compel the refunding of them."   And in *State Railroad Taxes, supra*, p. 613, Mr. Justice Miller observed: " The government of the United States has provided, both in the customs and in the internal revenue, a complete system of corrective justice in regard to all taxes imposed by the general government, which in both branches is founded upon the idea of appeals within the executive departments. If the party aggrieved does not obtain satisfaction in this mode, there are provisions for recovering the tax after it has been paid, by suit against the collecting officer.   But there is no place in this system for an application to a court of justice until after the money is paid."   *Patton* v. *Brady, Executrix*, 184 U. S. 608, 614.   By the statute the clerk is made the collector of the license taxes, and if this tax was illegal and paid under protest, and nothing in this or other legislation of Congress restrict such an action, very likely under these authorities an action would lie against him for the money thus wrongfully taken from the petitioner.

It may be also that an action could be maintained in the Court of Claims or in one of the Circuit or District Courts of the United States, under the Tucker act, to recover directly

from the United States. *Dooley* v. *United States*, 182 U. S. 222. But we are not called upon to decide what remedy by suit or action, if any, the petitioner may have. It is enough now to hold, as we do, that this novel proceeding was not a suit or action in which a final decree or judgment was rendered from which the petitioner could take an appeal to this court.

The order of the District Court is

*Affirmed.*

The CHIEF JUSTICE took no part in the decision of this case.