**BERNHEIM DISTILLING CO. v. MAYES, Internal Revenue Collector, et al.**

(District Court, W. D. Kentucky. October 11, 1920.)

No. 559.

1. **Internal revenue ⬦⟿38—In action to recover tax paid, facts must be fully shown.**

In an action to recover internal revenue taxes specially assessed by the Commissioner and paid under protest, the assessment is presumed prima facie to be correct; but, when such presumption is clearly overcome by plaintiff, it is incumbent on defendant to make a full and explicit showing of the facts on which the Commissioner acted.

2. **Internal revenue ⬦⟿12—Special assessment against rectifier not warranted.**

A special assessment against a rectifier of spirits, based on its recovery of "soakage" from the barrels in which the spirits were removed from warehouse, held not sustainable on the facts shown.

3. **Internal revenue ⬦⟿24—"Soakage" defined.**

The term "soakage," as used in the laws and regulations relating to withdrawal of liquors from bonded warehouses, means the spirits which in course of time in the warehouse had been absorbed by the staves of the barrel containing it.

At Law. Action by the Bernheim Distilling Company against T. Scott Mayes, Collector of Internal Revenue, and J. Rogers Gore, Deputy and Acting Collector. Trial to court. Judgment for plaintiff.

George Du Relle and Strother & Hamilton, all of Louisville, Ky., for plaintiff.

W. V. Gregory, U. S. Dist. Atty., of Louisville, Ky., for defendants.

WALTER EVANS, District Judge. This is an action at law to recover from the defendants $5,333.68, the amount of certain taxes assessed by the Commissioner of Internal Revenue against the plaintiff on certain spirits it had rectified, and which taxes the plaintiff paid under protest to J. Rogers Gore, deputy and acting collector, after Mr. Mayes had resigned. A jury was waived by the parties, and by their agreement the case was tried by the court. All testimony offered by the parties was heard and very carefully analyzed and considered by the court, with the result that the facts were found to be as follows:

(1) From July 1, 1917, to the 17th day of February, 1918, both dates inclusive, and for at least 14 years previously, the plaintiff was a wholesale dealer and a rectifier of distilled spirits in the city of Louisville, Ky.

(2) The process of rectifying distilled spirits at plaintiff's establishment was as follows: The taxes due the United States on the spirits to be rectified by plaintiff were always paid upon their withdrawal from the bonded warehouse, where, under the law of the United States, they had been deposited after distillation was completed, to remain until all taxes due thereon to the United States had been fully paid. After such full payment of all taxes due the plaintiff, as it was free to do, removed the distilled spirits to its rectifying establishment in said city. The process of rectification began on an upper floor of their establishment adapted to that purpose, when what was called a "dump," usually

⬦⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

made up of five barrels, was assembled near a trough. The bungs were removed from these barrels, and the contents of each barrel was, in succession, poured into the trough, from which the spirits ran through pipes to and into a large dumping tank on a lower floor. Two men were usually assigned to this work, one of whom usually removed the government stamps from the barrels after they were emptied, and after he had done this another of the men poured into each empty barrel about five gallons of distilled water, obtained from a nearby tank containing 150 or more gallons thereof, and, having done this, this man replaced the bung, shook each barrel in succession, and rolled it over to the dumping trough, where it was again dumped. The entire contents of the barrels thus treated, involving the water in the barrels, went into the dumping tank below, with the spirits previously there, and one of the objects of this was to lower the proof of the spirits in the tank, which was entirely lawful. This handling of five barrels took altogether 25 minutes, including the time taken for the spirits to run out of the barrels. The plaintiff, after this latter dumping, was free to treat the tax-paid contents of the dumping tank as it pleased, either by putting in more water, other tax-paid spirits, chemicals, and other ingredients, with the one exception of any untax-paid spirits; the use of the latter being altogether forbidden.

One object of this treatment was to rinse the inside of the barrels, where some parts of the spirits outside of the staves would remain, so as to save those remnants of tax-paid spirits by taking them up in the water and carrying them into the dumping tank, together with any particles of charcoal which might have been separated from the inner surface of the charred staves where such were used. This rinsing was entirely permissible under the law and practice at that time. Furthermore, all of this was preparatory to the re-use or sale of the barrels. The rectifying premises were always open to the visits of the internal revenue officers, and they in fact very frequently visited them.

[3] (3) When distilled spirits, after years of storage in distillery warehouses, are finally gauged for tax payment on withdrawal from the warehouse, the law and the regulations require a certain allowance to be made for what is called "soakage," viz. spirits which, in course of time in the warehouse, had been absorbed by the staves of the barrel containing it. This "soakage" cannot be obtained or extracted from those staves by the use of water, unless that water is of very high temperature and kept in the barrel for a considerable length of time. Water, when used by the plaintiff to rinse its barrels in the way described, while sometimes hot when drawn from the tank soon after the latter had been refilled from the water-distilling apparatus, was usually cool, or only warm, and none of what was used to rinse any of the barrels involved in this case remained in the barrels for rinsing purposes long enough to extract any material part of the "soakage."

(4) A special gauger, early in 1918, in examining into the question of the quantity of spirits rectified by the plaintiff, with a view to the taxation of 15 cents per gallon thereon imposed by section 304 of the act approved October 3, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 5986c), had found that there was an excess of such spirits on

hand as against a usual deficit in such cases. While that fact is not important in the case before us, it led to an examination by a revenue agent and the special gauger into the manner of plaintiff's treatment of the barrels it had emptied for rectification.

On the 15th, 16th, and 17th days of February, 1918, these revenue officers visited the plaintiff's rectifying establishment and there took possession of certain of the barrels which the plaintiff had emptied into the trough and dumping tank. Thirty of such barrels were thus taken after they had been thus emptied by plaintiff of the spirits they had contained. These revenue officers then poured hot water from the distilled water tank into these barrels and shook them about as long as plaintiff did in rinsing them. The barrels were then emptied by those officers, and thereafter the contents were subjected by them to such tests as they desired to make, and they reached the conclusion that the spirits contained in the water they had thus used was about one-third of a gallon per barrel, which would make 10 gallons recovered from the 30 barrels. The spirits thus recovered were not shown by the testimony of those officers nor claimed by them to be "soakage," and the court therefore finds that it was not "soakage," but remnants of tax-paid spirits left in the barrels, after those barrels had been rinsed by the revenue officers.

Nevertheless, upon the conclusion reached by the two revenue officers as to recoveries from the barrels they tested in February, 1918, they examined the official records to ascertain the number of barrels the plaintiff had rectified since July 1, 1919, and without in any way disclosing to the court in their testimony the number of such barrels, or whether the spirits they had recovered in rinsing exceeded in quantity what plaintiff, when it rinsed the barrels, had obtained, the testimony did show, and the court finds that they reported the results of their tests and investigations to the Commissioner of Internal Revenue, and that that officer acted upon that undivulged report in making the assessment now in question, and which assessment was made on 2,012.3 gallons of recovered spirits at $1.10 per gallon and 880.7 gallons of recovered spirits at $3.20 per gallon, as stated in the assessment. In this situation, developed by the testimony, the court finds that no part of the 10 gallons was "soakage," but that all of it was tax-paid spirits. The court also finds that no part of this 10 gallons was delivered to the plaintiff, although all of it was tax-paid spirits, and not "soakage."

(5) That the defendant Mayes, then the collector of internal revenue, on August 26, 1918, made demand upon plaintiff for the payment within 10 days of the whole amount of the taxes so assessed against the plaintiff. Within 10 days of that date, viz. on September 3, 1918, plaintiff filed a claim on form 47, prepared by the Commissioner of Internal Revenue, for the abatement of all the taxes so assessed; but on February 27, 1919, the Commissioner of Internal Revenue overruled, rejected, and denied said claim for such abatement of said taxes or any part thereof. On March 5, 1919, the defendant J. Rogers Gore, deputy and acting collector of internal revenue (Mr. Mayes having resigned), gave notice to plaintiff and demanded the payment of all the taxes so assessed, with interest, and threatened that, unless plaintiff paid

said taxes so assessed and interest thereon at the rate of 1 per cent. per month from September 3, 1918, amounting in the aggregate to $5,333.-68, he would collect the said sum, with 5 per cent. additional penalty, and interest at the rate of 1 per cent. per month until paid, by distraint and sale of the goods, chattels, and effects of the plaintiff. The plaintiff, on March 5, 1919, pursuant to said notice and because thereof, paid the said sum of $5,333.68 to the defendant Gore as deputy and acting collector of internal revenue; but plaintiff made said payment under protest then made to said defendant Gore, and accompanied said payment with a letter of protest, addressed and then delivered to said defendant Gore, in which was stated its protest and the grounds thereof.

(6) That on March 9, 1919, on form 46, prepared for that purpose by the internal revenue authorities, plaintiff made application to the Commissioner of Internal Revenue for the refunding of said $5,333.68, but that on August 2, 1919, the said Commissioner of Internal Revenue wholly rejected, overruled, and denied the plaintiff's claim and appeal for the refunding to it of the amount of the taxes so paid, viz. $5,-333.68.

In this situation plaintiff brought this action in the form approved by such cases as Patton v. Brady, 184 U. S. 614, 22 Sup. Ct. 493, 46 L. Ed. 713, and Pacific Whaling Co. v. United States, 187 U. S. 452, 23 Sup. Ct. 154, 47 L. Ed. 253. It goes without saying that every one owing it should pay, either voluntarily or under compulsion, every dollar of the taxes he owes the United States on distilled spirits; but equally is it true that no more than every such dollar should arbitrarily or otherwise be exacted from the citizen. It will be remembered that the law provides elaborate ways for ascertaining the amount due upon distilled spirits. It requires, upon the completion of the distillation, that the whisky shall be put into some separate retainer (usually a barrel) and deposited in a bonded warehouse in charge of government officials. At the time of being deposited in this way, every gallon of it is gauged by the officers of the government. Ultimately, in course of years, when the spirits are to be withdrawn, a final regauge is made, the proper allowances given by law are estimated, and the tax on the whisky shown by this regauge is necessarily paid upon the withdrawal of the spirits from the bonded warehouse.

As all know, however, there are sometimes found ways for evading the payment of the taxes due on distilled spirits, and an assessment by the Commissioner therefor is one of the plans devised for remedying the results of such or any evasions of the applicable law. But those assessments are largely, if not altogether, based upon somewhat inquisitorial and secret investigations, and the way to obtain a full hearing of the questions raised after such inquiry and consequent assessment is a suit like this. Such a suit would be unavailing, if the assessment could not, as to its basis, be fully inquired into in a judicial proceeding to test its validity upon the real facts to be then fully ascertained. The question then is: Was the assessment based upon justice and real facts, or was it founded upon suspicion and mere inference? The object here, as in all such litigations, is to do justice

alike to the government (which is behind the defendant) and to the citizen, and this can only be done by a full development of all the facts.

Broadly speaking, the controversy here is not whether the taxes ascertained to be due from the plaintiff on the final regauge, when the spirits were withdrawn from bond, had been paid (there being no claim that that was not done when the spirits were permitted by the government to be removed from the bonded warehouse), but is over an assessment made much later, and which, when considered in connection with the findings of fact, shows on its face that it was based upon the idea that what is called "soakage" had been "recovered" by plaintiff after the spirits had been dumped for rectification. Though the word "soakage" is not used in the assessment, its presence is necessarily implied, because no other spirits could be "recovered" from any of the barrels thus emptied, inasmuch as any remnants which were obtained by mere rinsing were tax-paid spirits. We therefore say that all spirits left in the barrels outside the staves when the dumping took place were necessarily tax-paid. This being so, we repeat that any claim to the right to assess taxes thereon must be confined to what might have been recovered from the "soakage," as that word is explained in the findings of fact, because no other spirits were omitted from the final regauge, and all that were included in that regauge were tax-paid when the spirits were withdrawn. The testimony offered by the plaintiff seemed clearly to show this, and the fact was conformably found.

It probably might properly be taken as a fact judicially known, and certainly at the trial it was explicitly admitted to be true, that there had never been any regulation which forbade the use of hot water in rinsing out the barrels emptied for rectification. This fact is very suggestive in connection with the idea that "soakage" was not easily recoverable. During all the preceding half century rinsing was not forbidden, nor was the use of hot water for that purpose. This is most significant in connection with the proposition that, with all the long experience of the Internal Revenue Office, it was not deemed necessary to make regulations on either subject. This indicates rather conclusively the difficulty, if not the impossibility, of recovering the "soakage" in the brief few minutes' time the revenue agent and the special gauger kept the water in the plaintiff's 30 empty barrels as shown by the testimony of those officers, and may explain why they testified to nothing about its having, in fact, been recovered from any of the 30 barrels.

[1] The Commissioner of Internal Revenue, having made the assessment, it was at the trial presumed, prima facie, to be accurate and proper. This presumption, however, was not conclusive, but was open to being overcome by adequate testimony. In this situation the burden, at the outset, was upon the plaintiff, and the testimony offered by it was clear and explicit. Unless refuted, it was sufficient to satisfy the court that this burden had been so far met as to make it, prima facie, certain that the assessment in question could not be sustained without further testimony in its support, so that the facts upon which the Commissioner had acted might be shown to be such as to justify what he did. In such circumstances, cases like this demand an explicit showing

of the real facts on both sides, so that the court can adequately understand the merits alike of the plaintiff's claim and the facts which tend to support the assessment.

This litigation brought the necessity and the present opportunity to both litigants to show by testimony the exact facts upon each side of the issue involved. Notwithstanding the failure upon defendant's part to make such showing of the facts, it was contended that the assessment made by the Commissioner was correct, and should be enforced. Inasmuch as an action at law like this is the sole means afforded by law for testing the accuracy and correctness of such assessments, when, as here, they are called in question in a court of law in the regular way, it devolved upon defendant to show all the facts upon which the Commissioner acted—this testimony, prima facie, being entirely available, either from the Commissioner's office or in this city. The time for mere inferences had passed at this stage, and the demand was for a full showing of the facts. If those facts existed they should have been given in testimony.

[2] The testimony offered by the defendant must be regarded as all that was available, and it is clear, therefore, that the assessment was based entirely upon a showing that on February 15, 16, and 17, 1918, an examination was made by the revenue officers mentioned of 30 barrels of spirits which had just been dumped into the rectifying trough by the plaintiff; that promptly 5 gallons of very hot water had then been poured into those empty barrels by the revenue agent and the special gauger; that the barrels were then shaken by them; that the then contents thereof were allowed to remain in the barrels about as long as plaintiff had shown that it had permitted it to remain in the other barrels when it rinsed them, viz. about 5 minutes; and that those revenue officers by this process obtained from the 30 barrels what they testified was an average of a third of a gallon of spirits from each. This would amount to 10 gallons for the 30 barrels; but, though this recovery might have seemed somewhat excessive, the testimony in no way shows this 10 gallons to have, in fact, been "soakage," or if it were so to any extent the testimony of the defendant did not mention it, nor attempt to explain it, although the burden was then upon him to do that very thing. If there were any "soakage" recovered by the revenue officers, its quantity was not mentioned in their testimony; nor did that testimony in any way positively suggest that it was "soakage."

Equally true is it in this connection, as we have seen, that everything in the barrels that was not "soakage" was tax-paid spirits, and the recoveries from the 30 barrels of a possible 10 gallons were never returned to the plaintiff, the owner of it (which ought to show that no tax should be imposed upon it), nor was there any suggestion made to plaintiff that it was claimed to be "soakage." On this showing, in the entire absence of any adequate testimony tending to prove the number of barrels plaintiff had dumped for rectification during the period from July 1, 1917, to February 15, 1918, we must conclude that the assessment was based upon inferences drawn from the recovery of those 10 gallons, without a showing of any fact to support the assessment of over $5,000 made by the Commissioner on 2,893 gallons of "recovered"

spirits. Was not this, to say the least of it, a very broad inference from particularly restricted premises? It does not seem that there could be any but an affirmative answer to this inquiry. Consequently this does not seem to the court to be a case in which the testimony would justify the sustaining of the assessment.

Accordingly we have concluded that the only way to reach the justice of this case, upon the facts found after full hearing and full consideration of the testimony, is to hold, as the court now does, that the plaintiff is entitled to the full relief it asks as against defendant Gore, who collected and received the money as deputy and acting collector, because the facts developed do not show that the assessment in this case was well founded, either upon fact or upon law. As to defendant Mayes, the action will be dismissed.

A judgment accordingly will be entered, awarding to the plaintiff the full amount claimed, with interest from the 5th day of March, 1919, and its costs herein expended.