# BOB JONES UNIVERSITY *v.* SIMON, SECRETARY OF THE TREASURY, ET AL.

No. 72–1470.  Argued January 7, 1974—Decided May 15, 1974

PoWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed an opinion concurring in the result, *post*, p. 750. DOUGLAS, J., took no part in the decision of the case.

*J. D. Todd, Jr.,* argued the cause for petitioner. With him on the briefs were *Wesley M. Walker* and *Oscar Jackson Taylor, Jr.*

*Assistant Attorney General Crampton* argued the cause for respondents. With him on the brief were *Solicitor General Bork, Stuart A. Smith, Grant W. Wiprud,* and *Leonard J. Henzke, Jr.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case and *Commissioner v. "Americans United" Inc., post,* p. 752, involve the application of the Anti-

Injunction Act, § 7421 (a) of the Internal Revenue Code of 1954 (the Code), 26 U. S. C. § 7421 (a), to the ruling-letter program of the Internal Revenue Service (the Service) for organizations claiming tax-exempt status under Code § 501 (c)(3), 26 U. S. C. § 501 (c)(3). The question presented is whether, prior to the assessment and collection of any tax, a court may enjoin the Service from revoking a ruling letter declaring that petitioner qualifies for tax-exempt status and from withdrawing advance assurance to donors that contributions to petitioner will constitute charitable deductions under Code § 170 (c)(2), 26 U. S. C. § 170 (c)(2). We hold that it may not.

I

Section 501 (a) of the Code exempts from federal income taxes organizations described in § 501 (c)(3). The latter provision encompasses:

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

Section 501 (c)(3) organizations are also exempt from federal social security (FICA) taxes by virtue of Code § 3121 (b)(8)(B), 26 U. S. C. § 3121 (b)(8)(B), and from federal unemployment (FUTA) taxes by virtue of § 3306 (c)(8), 26 U. S. C. § 3306 (c)(8). Dona-

tions to § 501 (c)(3) organizations are tax deductible under § 170 (c)(2).[1]

As a practical matter, an organization hoping to solicit tax-deductible contributions may not rely solely on technical compliance with the language of §§ 501 (c)(3) and 170 (c)(2). The organization must also obtain a ruling letter from the Service, pursuant to Rev. Procs. 72–3 and 72–4, 1972–1 Cum. Bull. 698, 706, declaring that it qualifies under § 501 (c)(3). Receipt of such a ruling letter leads, in the ordinary case, to inclusion in

---

[1] Section 170 (a) of the Code provides that "[t]here shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. . . ." Section 170 (c)(2) declares:

"Charitable contribution defined.—For purposes of this section, the term 'charitable contribution' means a contribution or gift to or for the use of—

"(2) A corporation, trust, or community chest, fund, or foundation—

"(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States;

"(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;

"(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

"(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

The organizations set forth in § 170 (c)(2) are, but for a few unimportant exceptions, the same as those described in § 501 (c)(3). Analogous deductions for contributions to § 501 (c)(3) organizations are provided for federal estate and gift tax purposes. See Code §§ 2055 (a)(2) and 2522 (a)(2), 26 U. S. C. §§ 2055 (a)(2) and 2522 (a)(2).

the Service's periodically updated Publication No. 78, "Cumulative List of Organizations described in Section 170 (c) of the Internal Revenue Code of 1954" (the Cumulative List). In essence, the Cumulative List is the Service's official roster of tax-exempt organizations: "The listing of an organization in [the Cumulative List] signifies it has received a ruling or determination letter . . . stating that contributions by donors to the organization are deductible as provided in section 170 of the Code." Rev. Proc. 72–39, 1972–2 Cum. Bull. 818. An organization's inclusion in the Cumulative List assures potential donors in advance that contributions to the organization will qualify as charitable deductions under § 170 (c)(2). The Service has announced that, with narrowly limited exceptions, a donor may rely on the Cumulative List for so long as the beneficiaries of his largesse maintain their listing, regardless of their actual tax status.[2] For this reason, appearance on the Cumulative List is a prerequisite to successful fund raising

---

[2] Section 3.01 of Rev. Proc. 72–39, 1972–2 Cum. Bull. 818, provides:

"Where an organization listed in [the Cumulative List] ceases to qualify as an organization contributions to which are deductible under section 170 of the Code and the Service subsequently revokes a ruling or a determination letter previously issued to it, contributions made to the organization by persons unaware of the changes in the status of the organization generally will be considered allowable if made on or before the date of publication of the Internal Revenue Bulletin announcing that contributions are no longer deductible. However, the Service is not precluded from disallowing a deduction for any contribution made after an organization ceases to qualify under section 170, where the contributor (1) had knowledge of the revocation of the ruling or determination letter, (2) was aware that such revocation was imminent, or (3) was in part responsible for, or was aware of, the activities or deficiencies on the part of the organization that gave rise to the loss of qualification."

for most charitable organizations. Many contributors simply will not make donations to an organization that does not appear on the Cumulative List.[3]

Because of the importance of inclusion in the Cumulative List, revocation of a § 501 (c)(3) ruling letter and consequent removal from the Cumulative List is likely to result in serious damage to a charitable organization.[4] Revocation not only threatens the flow of contributions, it also subjects the affected organization to FICA and FUTA taxes and, assuming that the organization has taxable income and does not qualify as tax exempt under another subsection of § 501, to federal income taxes.[5] Upon the assessment and attempted collection of income taxes, the organization may litigate the legality of the Service's action by petitioning the Tax Court to review a notice of deficiency. See Code §§ 6212 and 6213, 26 U. S. C. §§ 6212 and 6213. Or, following the collection of any federal tax and the denial of a refund by the Service, the organization may bring a

---

[3] This is particularly so with respect to tax-exempt private foundations, because they are subject to tax liability if they contribute funds to an organization that does not qualify under § 170 (c)(2). See Code § 4945 (d)(5), 26 U. S. C. § 4945 (d)(5).

[4] In recognition of the significance of such a change in status, the Service provides several stages of internal administrative review. If the Service indicates, pursuant to prescribed procedures, that cause for revocation exists, the affected organization is entitled to submit written protests and to have conferences at both the District Director and National Office level. § 11, Rev. Proc. 72–4, 1972–1 Cum. Bull., at 708; § 4, Rev. Proc. 72–39, 1972–2 Cum. Bull., at 818–819.

[5] An organization may lose its § 501 (c)(3) status but still be exempt from federal income taxes if it qualifies, for example, as a § 501 (c)(4) social welfare organization. But the loss of § 501 (c)(3) status inevitably means that the exemptions from FICA and FUTA taxes no longer apply, since those exemptions are keyed to § 501 (c)(3). See Code §§ 3121 (b)(8)(B) and 3306 (c)(8).

refund suit in a federal district court or in the Court of Claims. See Code § 7422, 26 U. S. C. § 7422; 28 U. S. C. §§ 1346 (a)(1) and 1491. Finally, a donor to the organization may bring a refund suit to challenge the denial of a charitable deduction under § 170 (c)(2). Presumably such a "friendly donor" would be able to attack the legality of the Service's revocation of an organization's § 501 (c)(3) status. But these post-revocation avenues of review take substantial time, during which the organization is certain to lose contributions from those donors whose gifts are contingent on entitlement to charitable deductions under § 170 (c)(2). Accordingly, any organization threatened with revocation of a § 501 (c)(3) ruling letter has a powerful incentive to bring a pre-enforcement suit to prevent the Service from taking action in the first instance.

The pressures operating on organizations facing revocation of § 501 (c)(3) status to seek injunctive relief against the Service pending judicial review of the proposed action conflict directly with a congressional prohibition of such pre-enforcement tax suits. In force continuously since its enactment in 1867, the Anti-Injunction Act, now Code § 7421 (a), provides in pertinent part that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court . . . ." [6] Because an injunction

---

[6] See Act of Mar. 2, 1867, § 10, 14 Stat. 475; Rev. Stat. §.3224 (1874); Int. Rev. Code of 1939, § 3653. Section 7421 (a) of the Code states:

"Except as provided in sections 6212 (a) and (c), 6213 (a), and 7426 (a) and (b)(1), *no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court* by any person, whether or not such person is the person against whom such tax was assessed." (Emphasis added.)

The italicized portion of § 7421 (a) is identical to language in § 10 of the Act of Mar. 2, 1867, but for the first "any," which the revisers

preventing the Service from withdrawing a § 501 (c)(3) ruling letter would necessarily preclude the collection of FICA, FUTA, and possibly income taxes from the affected organization, as well as the denial of § 170 (c)(2) charitable deductions to donors to the organization, a suit seeking such relief falls squarely within the literal scope of the Act.[7]

added to the Revised Statutes version. See *Snyder* v. *Marks,* 109 U. S. 189, 192 (1883). None of the exceptions in § 7421 (a) is relevant to this case. The phrase commencing with "by any person . . ." was added by § 110 (c) of the Federal Tax Lien Act of 1966, Pub. L. 89–719, 80 Stat. 1144. The main purpose of the addition of this language was to deal with cases where third parties who are not themselves subject to tax liability hold property liens that compete with federal tax liens. Due to the literal meaning of the Anti-Injunction Act, such persons were, prior to 1966, often unable to protect their legitimate property interests when the Service foreclosed on property on which it held a tax lien. See H. R. Rep. No. 1884, 89th Cong., 2d Sess., 27–28 (1966). Such persons are now given a right of action under Code § 7426, 26 U. S. C. § 7426, and the language of § 7421 (a), as amended, renders that action exclusive. The "by any person" phrase is, however, also a reaffirmation of the plain meaning of the emphasized portion of § 7421 (a). In this respect, it is declaratory, not innovative. Cf. Bittker & Kaufman, Taxes and Civil Rights: "Constitutionalizing" the Internal Revenue Code, 82 Yale L. J. 51, 57, n. 22 (1972). We are aware of the contrary reading of the "by any person" phrase in *McGlotten* v. *Connally,* 338 F. Supp. 448, 453 n. 25 (DC 1972) (three-judge court), but we are of a different view.

[7] The congressional antipathy for premature interference with the assessment or collection of any federal tax also extends to declaratory judgments. In 1935, one year after the enactment of the Declaratory Judgment Act, 48 Stat. 955, now 28 U. S. C. §§ 2201–2202, Congress amended that Act to exclude suits "with respect to Federal taxes . . . ," § 405 of the Revenue Act of 1935, c. 829, 49 Stat. 1027, thus reaffirming the restrictions set out in the Anti-Injunction Act. The Declaratory Judgment Act now reads:

"§ 2201. Creation of Remedy.

"In a case of actual controversy within its jurisdiction, *except with respect to Federal taxes,* any court of the United States, upon

The clash between the language of the Anti-Injunction Act and the desire of § 501 (c)(3) organizations to block the Service from withdrawing a ruling letter has been resolved against the organizations in most cases. *E. g.,*

the filing of an appropriate pleading, may declare the rights· and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." (Emphasis added.)

"§ 2202. Further relief.·

"Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

Some have noted that the federal tax exception to the Declaratory Judgment Act may be more sweeping than the Anti-Injunction Act. *E. g.,* E. Borchard, Declaratory Judgments 855 (2d ed. 1941); Bittker & Kaufman, *supra,* n. 6, at 58. See S.· Rep. No. 1240, 74th Cong., 1st Sess., 11 (1935). The Service takes that position in this case, arguing that any suit for an injunction is also an action for a declaratory judgment and thus is barred by the literal terms of the Declaratory Judgment Act, without regard to the independent force of § 7421 (a). A number of courts, on the other hand, have held that the federal tax exception to the Declaratory Judgment Act and the Anti-Injunction Act have coterminous application. · *E. g., "Americans United" Inc.* v. *Walters,* 155 U. S. App. D. C. 284, 291, 477 F. 2d 1169, 1176 (1973), rev'd *sub nom. Commissioner* v. *"Americans United" Inc., post,* p. 752; *Tomlinson* v. *Smith,* 128 F. 2d 808 (CA7 1942); *McGlotten* v· *Connally, supra; Jules Hairstylists of Maryland, Inc.* v. *United States,* 268 F. Supp. 511 (Md.· 1967), aff'd, 389 F. 2d 389 (CA4), cert. denied, 391 U. S. 934 (1968). Petitioner cites these cases in response to the Service's reliance on the Declaratory Judgment Act. There is no dispute, however, that the federal tax exception to the Declaratory· Judgment Act is at least as broad as the Anti-Injunction Act. · Be-· cause we hold that the instant case is barred by the latter provision, there is no occasion to resolve whether the former is even more preclusive. Nor need we decide whether any action for an injunction is of necessity a request for a declaration of rights that triggers the·· terms of the Declaratory Judgment Act.

*Crenshaw County Private School Foundation* v. *Connally*, 474 F. 2d 1185 (CA5 1973), pet. for cert. pending in No. 73–170; *National Council on the Facts of Over-population* v. *Caplin*, 224 F. Supp. 313 (DC 1963); *Israelite House of David* v. *Holden*, 14 F. 2d 701 (WD Mich. 1926).[8] But see *McGlotten* v. *Connally*, 338 F. Supp. 448 (DC 1972) (three-judge court). Cf. *Green* v. *Connally*, 330 F. Supp. 1150 (DC), aff'd *per curiam sub nom. Coit* v. *Green*, 404 U. S. 997 (1971).

In the present case, the Court of Appeals for the Fourth Circuit followed the majority view. *Bob Jones University* v. *Connally*, 472 F. 2d 903, petition for rehearing denied, 476 F. 2d 259 (1973). In light of the contrary result reached by the Court of Appeals for the District of Columbia Circuit in *"Americans United" Inc.* v. *Walters*, 155 U. S. App. D. C. 284, 477 F. 2d 1169 (1973), rev'd *sub nom. Commissioner* v. *"Americans United" Inc., post,* p. 752, we granted Bob Jones University's petition for certiorari. 414 U. S. 817 (1973).

## II

Petitioner refers to itself as "the world's most unusual university." Founded in 1927 and now located in Greenville, South Carolina, the University is devoted to the teaching and propagation of its fundamentalist religious beliefs. All classes commence and close with prayer,

---

[8] Several courts have reached the same result under the federal tax exception to the Declaratory Judgment Act, set forth in n. 7, *supra.* E. g., *Liberty Amendment Committee of the U. S. A.* v. *United States,* Civil Action No. 70–721 (CD Cal. June 19, 1970) (unpublished), aff'd *per curiam,* No. 26507 (CA9 July 7, 1972) (unpublished); cert. denied, 409 U. S. 1076 (1972); *Mitchell* v. *Riddell,* 402 F. 2d 842 (CA9 1968), appeal dismissed and cert. denied, 394 U. S. 456 (1969); *Jolles Foundation, Inc.* v. *Moysey,* 250 F. 2d 166 (CA2 1957); *Kyron Foundation* v. *Dunlap,* 110 F. Supp. 428 (DC 1952).

and courses in religion are compulsory. Students and faculty are screened for adherence to certain religious precepts and may be expelled or dismissed for lack of allegiance to them. One of these beliefs is that God intended segregation of the races and that the Scriptures forbid interracial marriage. Accordingly, petitioner refuses to admit Negroes as students. On pain of expulsion students are prohibited from interracial dating, and petitioner believes that it would be impossible to enforce this prohibition absent the exclusion of Negroes.

In 1942, the Service issued petitioner a ruling letter under § 101 (6) of the Internal Revenue Code of 1939, the predecessor of § 501 (c)(3). In 1970, however, the Service announced that it would no longer allow § 501 (c)(3) status for private schools maintaining racially discriminatory admissions policies and that it would no longer treat contributions to such schools as tax deductible. See Rev. Rul. 71–447, 1971–2 Cum. Bull. 230. The Service requested proof of a nondiscriminatory admissions policy from all such schools and warned that tax-exempt ruling letters would be reviewed in light of the information provided. At the end of 1970, petitioner advised the Service that it did not admit Negroes, and in September 1971, further stated that it had no intention of altering this policy. The Commissioner of Internal Revenue therefore instructed the District Director to commence administrative procedures leading to the revocation of petitioner's § 501 (e)(3) ruling letter.

Petitioner brought these administrative proceedings to a halt by filing suit in the United States District Court for the District of South Carolina for preliminary and permanent injunctive relief preventing the Service from revoking or threatening to revoke petitioner's tax-exempt status. Petitioner alleged irreparable injury in the form of substantial federal income tax liability and the loss of

contributions. Petitioner asserted that the Service's threatened action was outside its lawful authority and would violate petitioner's rights to the free exercise of religion, to free association, and to due process and equal protection of the laws.

The District Court rejected a motion to dismiss for lack of jurisdiction, and it preliminarily enjoined the Service from revoking or threatening to revoke petitioner's tax-exempt status and from withdrawing advance assurance of the deductibility of contributions made to petitioner. *Bob Jones University* v. *Connally*, 341 F. Supp. 277 (1971). The Court of Appeals for the Fourth Circuit reversed, with one judge dissenting. 472 F. 2d 903, reh. den., 476 F. 2d 259 (1973). That court held that petitioner's suit was barred by the Anti-Injunction Act as interpreted by this Court in *Enochs* v. *Williams Packing & Navigation Co.*, 370 U. S. 1. (1962).

## III

The Anti-Injunction Act apparently has no recorded legislative history,[9] but its language could scarcely be more explicit—"no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court . . . ." The Court has interpreted the principal purpose of this language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of pre-enforcement judicial interference, "and to require that the legal right to the disputed sums be determined in a suit for refund." *Enochs* v. *Williams Packing & Navi-*

---

[9] See Note, Enjoining the Assessment and Collection of Federal Taxes Despite Statutory Prohibition, 49 Harv. L. Rev. 109 n. 9 (1935); Gorovitz, Federal Tax Injunctions and the Standard Nut Cases, 10 Taxes 446 n. 6 (1932).

gation Co., supra, at 7. See also, e. g., State Railroad Tax Cases, 92 U. S. 575, 613–614 (1876). Cf. Cheatham v. United States, 92 U. S. 85, 88–89 (1876). The Court has also identified "a collateral objective of the Act—protection of the collector from litigation pending a suit for refund." Williams Packing, supra, at 7–8.

In furtherance of these goals, the Court in its most recent reading gave the Act almost literal effect. In Williams Packing, an employer sought to enjoin the collection of FICA and FUTA taxes that the employer alleged were not owed and would destroy its business. The Court held unanimously that the suit was barred by the Act. Only upon proof of the presence of two factors could the literal terms of § 7421 (a) be avoided: first, irreparable injury, the essential prerequisite for injunctive relief in any case; and second, certainty of success on the merits. Id., at 6–7. An injunction could issue only "if it is clear that under no circumstances could the Government ultimately prevail . . . ." Id., at 7. And this determination would be made on the basis of the information available to the Government at the time of the suit. "Only if it is then apparent that, under the most liberal view of the law and the facts, the United States cannot establish its claim, may the suit for an injunction be maintained." Ibid.

Perhaps in recognition of the stringent nature of the Williams Packing standard and its implications for this case, petitioner makes little effort to argue that it can meet that test. Rather, it asserts that the Anti-Injunction Act, properly construed, is not applicable, that Williams Packing is not the controlling reading of the Act, and that rejection of both these contentions would work a denial of due process of law. We find these arguments unpersuasive.

## A

First, petitioner contends that the Act is inapplicable because this is not a suit "for the purpose of restraining the assessment or collection of any tax . . . ." Under petitioner's theory, its suit is intended solely to compel the Service to refrain from withdrawing petitioner's § 501 (c)(3) ruling letter and from depriving petitioner's donors of advance assurance of deductibility. Petitioner describes its goal as the maintenance of the flow of contributions, not the obstruction of revenue.

Petitioner's complaint and supporting documents filed in the District Court belie any notion that this is not a suit to enjoin the assessment or collection of federal taxes from petitioner. In support of its claim of irreparable injury, petitioner alleged in part that it would be subject to "substantial" federal income tax liability if the Service were allowed to carry out its threatened action. App. 6. Petitioner buttressed this contention with sworn affidavits alleging federal income tax liability of three-quarters of a million dollars for one year and in excess of half a million dollars for another and stressing the detrimental effect such tax liability would have on petitioner's capacity to operate its institution, to support its personnel, and to continue with its expansion plans. *Id.*, at 10–11, 43–44. These allegations leave little doubt that a primary purpose of this lawsuit is to prevent the Service from assessing and collecting income taxes from petitioner.

We recognize that petitioner's assertions that it will owe federal income taxes should its § 501 (c)(3) status be revoked are open to debate, because they are based in part on a failure to take into account possible deductions for depreciation of plant and equipment. Even if it could be shown, however, that petitioner would owe no federal income taxes if its § 501 (c)(3) status were

revoked, this would still be a suit to restrain the assessment or collection of taxes because petitioner would also be liable for FICA and FUTA taxes. Section 7421 (a) speaks of "any tax"; it does not differentiate between federal income taxes or FICA or FUTA taxes. See, *e. g., Williams Packing, supra.* Moreover, petitioner seeks to restrain the collection of taxes from its donors—to force the Service to continue to provide advance assurance to those donors that contributions to petitioner will be recognized as tax deductible, thereby reducing their tax liability. Although in this regard petitioner seeks to lower the taxes of those other than itself, the Act is nonetheless controlling.[10] Thus in any of its implications, this case falls within the literal scope and the purposes of the Act.

Petitioner further contends that the Service's actions do not represent an effort to protect the revenues but an attempt to regulate the admissions policies of private universities. Under this line of argument, the Anti-

---

[10] See n. 6, *supra.* Petitioner argues that the revenues will be unaffected by the loss of its § 501 (c)(3) status, since if petitioner loses its ruling letter, donors will simply redirect their gifts to organizations whose tax-exempt status is secure, thus obtaining the same § 170 (c)(2) charitable deductions they presently enjoy when they make contributions to petitioner. It follows, according to petitioner, that the Act's principal purpose of protecting the revenues is not threatened by an injunction preserving petitioner's § 501 (c)(3) status. Thus, the Act should be found inapplicable.

The argument is too speculative to be persuasive. It presumes that all donors who take § 170 (c)(2) deductions will desert petitioner if the ruling letter is withdrawn and that all such donors will make gifts in equivalent amounts to other tax-exempt organizations. We deem it unlikely that either premise is wholly true. To the extent that either premise is inaccurate, an injunction preserving petitioner's § 501 (c)(3) ruling letter will interrupt the assessment and collection of taxes.

Injunction Act is said to be inapplicable because the case does not truly involve taxes. We disagree.

The Service bases its present position with regard to the tax status of segregative private schools on its interpretation of the Code.[11] There is no evidence that that position does not represent a good-faith effort to enforce the technical requirements of the tax laws, and, without indicating a view as to whether the Service's interpretation is correct, we cannot say that its position has no legal basis or is unrelated to the protection of the revenues. The Act is therefore applicable. Petitioner's attribution of non-tax-related motives to the Service ignores the fact that petitioner has not shown that the Service's action is without an independent basis in the requirements of the Code. Moreover, petitioner's argument fails to give appropriate weight to *Bailey* v. *George,* 259 U. S. 16 (1922). In that case, the Court held that the Act blocked a pre-enforcement suit to enjoin collection of the federal Child Labor Tax, although the tax was challenged as a regulatory measure beyond the taxing power of Congress. Significantly, the Court announced *Bailey* v. *George* on the same day that it issued *Bailey* v. *Drexel Furniture Co.,* 259 U. S. 20

---

[11] See Rev. Rul. 71–447, 1971–2 Cum. Bull. 230. The question of whether a segregative private school qualifies under § 501 (c) (3) has not received plenary review in this Court, and we do not reach that question today. Such schools have been held not to qualify under § 501(c)(3) in *Green* v. *Connally,* 330 F. Supp. 1150 (DC) (three-judge court), aff'd *per curiam sub. nom. Coit* v. *Green,* 404 U. S. 997 (1971). As a defendant in *Green,* the Service initially took the position that segregative private schools were entitled to tax-exempt status under § 501 (c) (3), but it reversed its position while the case was on appeal to this Court. Thus, the Court's affirmance in *Green* lacks the precedential weight of a case involving a truly adversary controversy.

(1922), a tax-refund case in which the Court struck down the Child Labor Tax Law as unconstitutional on the grounds that the taxpayer attempted to raise prematurely in *Bailey* v. *George*.[12]

Petitioner also argues that § 7421 (a) is not controlling because when the Act was passed in 1867 Congress could not possibly have foreseen something as sophisticated as the comparatively recent ruling-letter program[13] and the special importance of that program for § 501 (c)(3) organizations. This argument proves too much, however, since the same Congress also could not have foreseen, for example, FICA or FUTA taxes, to which the prohibitory command of § 7421 (a) indisputably applies. See, *e. g.*, *Williams Packing, supra.* Moreover, through the years Congress has repeatedly re-enacted the Anti-Injunction Act[14] at times when it was obviously aware of

[12] In support of its argument that this case does not involve a "tax" within the meaning of § 7421 (a), petitioner cites such cases as *Hill* v. *Wallace*, 259 U. S. 44 (1922) (tax on unregulated sales of commodities futures), and *Lipke* v. *Lederer*, 259 U. S. 557 (1922) (tax on unlawful sales of liquor). It is true that the Court in those cases drew what it saw at the time as distinctions between regulatory and revenue-raising taxes. But the Court has subsequently abandoned such distinctions. *E. g.*, *Sonzinsky* v. *United States*, 300 U. S. 506, 513 (1937). Even if such distinctions have merit, it would not assist petitioner, since its challenge is aimed at the imposition of federal income, FICA, and FUTA taxes which clearly are intended to raise revenue.

[13] The currently prevailing ruling-letter program of the Service commenced in 1940, see Caplin, Taxpayer Rulings Policy of the Internal Revenue Service: A Statement of Principles, NYU 20th Inst. on Fed. Tax 1, 2, 4–5 (1962), although its formal announcement did not take place until 1953. Rev. Rul. 10, 1953–1 Cum. Bull. 488.

[14] The most recent re-enactment, in the Internal Revenue Code of 1954, postdates both the actual and the formal commencement of the Service's ruling-letter program for § 501 (c)(3) organizations. See n. 13, *supra*.

the continuously increasing complexity of the federal tax system.[15]

## B

Petitioner next argues that *Enochs* v. *Williams Packing & Navigation Co., supra,* does not constitute an all-encompassing reading of the Act. Petitioner contends, on the basis of prior precedents, that § 7421 (a) is subject to judicially created exceptions other than the "under no circumstances" test announced in *Williams Packing.* But the Court's unanimous opinion in *Williams Packing* indicates that the case was meant to be the capstone to judicial construction of the Act. It spells an end to a cyclical pattern of allegiance to the plain meaning of the Act, followed by periods of uncertainty caused by a judicial departure from that meaning, and followed in turn by the Court's rediscovery of the Act's purpose.

During the first half century of the Act's existence, the Court gave it literal force, without regard to the character of the tax, the nature of the pre-enforcement challenge to it, or the status of the plaintiff. See *State Railroad Tax Cases,* 92 U. S., at 613–614; *Snyder* v. *Marks,* 109 U. S. 189 (1883); *Pacific Steam Whaling Co.* v. *United States,* 187 U. S. 447 (1903); *Dodge* v. *Osborn,* 240 U. S. 118 (1916); *Bailey* v. *George,* 259 U. S. 16 (1922).[16] Occasionally, however, the Court noted in

---

[15] In addition to repeatedly re-enacting the Anti-Injunction Act, Congress reaffirmed the Act's purpose by adding the federal tax exception to the Declaratory Judgment Act. See n. 7, *supra.*

[16] The Anti-Injunction Act was written against the background of general equitable principles disfavoring the issuance of federal injunctions against taxes, absent clear proof that available remedies at law were inadequate. *E. g., Dows* v. *City of Chicago,* 11 Wall. 108, 109–110 (1871); *Shelton* v. *Platt,* 139 U. S. 591 (1891); *Pittsburgh & C. R. Co.* v. *Board of Pub. Works,* 172 U. S. 32 (1898). See

dictum that unspecified extraordinary and exceptional circumstances might justify an injunction despite the Act. *E. g., Dodge* v. *Osborn, supra,* at 122; *Bailey* v. *George, supra,* at 20. In 1922, the Court seized upon these dicta and permitted pre-enforcement injunctive suits against tax statutes that were viewed as penalties or as adjuncts to the criminal law. *Hill* v. *Wallace,* 259 U. S. 44 (1922); *Lipke* v. *Lederer,* 259 U. S. 557 (1922); *Regal Drug Corp.* v. *Wardell,* 260 U. S. 386 (1922). Shortly thereafter, however, the Court made clear that *Hill, Lipke,* and *Regal Drug* were of narrow scope and had no application to pre-enforcement challenges to truly revenue-raising tax statutes. *Graham* v. *Du Pont,* 262 U. S. 234 (1923).[17] Thus, the Court's first departure from a literal reading of the Act produced a prompt correction in course.

---

*California* v. *Latimer,* 305 U. S. 255, 261–262 (1938) (Brandeis, J., for a unanimous Court):

"[The delay inherent in pursuing remedies at law], it is urged, is a special circumstance which justifies resort to a suit for an injunction in order that the question of liability may be promptly determined. If the delay incident to such proceedings justified refusal to pay a tax, the federal rule that a suit in equity will not lie to restrain collection on the sole ground that the tax is illegal, could have little application. For possible delay of that character is the common incident of practically every contest over the validity of a federal tax." (Footnote omitted.)

Since equitable principles militating against the issuance of federal injunctions in tax cases existed independently of the Anti-Injunction Act, it is most unlikely that Congress would have chosen the stringent language of the Act if its purpose was merely to restate existing law and not to compel litigants to make use solely of the avenues of review opened by Congress. For this reason, it is not surprising that the early cases interpreting the Act read it at face value.

[17] As noted earlier, the Court has also abandoned the view that bright-line distinctions exist between regulatory and revenue-raising taxes. See n. 12, *supra.*

In the 1930's the Court decided *Miller* v. *Standard Nut Margarine Co.*, 284 U. S. 498 (1932), and *Allen* v. *Regents of the University System of Georgia*, 304 U. S. 439 (1938), the cases relied on most heavily by petitioner. *Standard Nut* set forth a new definition of the extraordinary and exceptional circumstances test, which was followed in *Regents*. In *Standard Nut* the Court stated that the Act is merely "declaratory of the principle" of cases prior to its passage that equity usually, but not always, disavows interference with tax collection; thus, the Act was to be construed "as near as may be in harmony with [equity doctrine] and the reasons upon which it rests." 284 U. S., at 509. Through this interpretation, the concept of extraordinary and exceptional circumstances was reduced to the traditional equitable requirements for issuance of an injunction.

*Standard Nut* was such a significant deviation from precedent that it was referred to by a commentator at the time as "a tribute to the tenacity of the American taxpayer" and "little short of phenomenal." [18] Read literally, the Court's opinion effectively repealed the Act, since the Act was viewed as requiring nothing more than equity doctrine had demanded before the Act's passage. The incongruity of this position has not escaped notice. [19] It undoubtedly led directly to the Court's re-

---

[18] Gorovitz, Federal Tax Injunctions and the Standard Nut Cases, 10 Taxes 446 (1932). Mr. Justice Stone, joined in dissent by Mr. Justice Brandeis, underlined the tension between *Standard Nut* and prior precedent: "Enacted in 1867, [the Anti-Injunction Act], for more than sixty years, has been consistently applied as precluding relief, whatever the equities alleged." 284 U. S., at 511.

[19] *E. g.*, Lenoir, Congressional Control Over Suits to Restrain the Assessment or Collection of Federal Taxes, 3 Ariz. L. Rev. 177, 195 (1961).

"In effect [*Standard Nut*] says that if special circumstances exist which bring the case within some acknowledged head of equity juris-

examination of the requirements of the Act in *Williams
Packing,* the second time the Court has undertaken to
rehabilitate the Act following debilitating departures
from its explicit language.   See *Graham* v. *Du Pont,*
*supra.*

*Williams Packing* switched the focus of the extraordi-
nary and exceptional circumstances test from a showing
of the degree of harm to the plaintiff absent an
injunction to the requirement that it be established
that the Service's action is plainly without a legal basis.
The Court in essence read *Standard Nut* not as an in-
stance of irreparable injury but as a case where the
Service had no chance of success on the merits.   370
U. S., at 7.   And the Court explicitly held that the
Act may not be evaded "merely because collection would
cause an irreparable injury, such as the ruination of the
taxpayer's enterprise." *Id.,* at 6.   Yet petitioner's argu-
ment that we should find *Williams Packing* inapplicable
turns, in the last analysis, on its claim that to do other-
wise would subject it to great harm.   The Court rejected
that consideration in *Williams Packing* itself, and we
reject it as a reason for finding that case not controlling.
Under the language of the Act, the degree of harm is
not a factor, and as a matter of judicial construction,
it does not provide a meaningful stopping point between
*Standard Nut* and *Williams Packing.*   Acceptance of
petitioner's irreparable injury argument would simply

---

diction, [the Anti-Injunction Act] does not apply, and the Court
may issue an injunction.   But in the absence of such circumstances
the Court will lack equity jurisdiction because there will be no basis
for such jurisdiction.   To say that [the Act] applies only in such
cases seems a little absurd.   It is tantamount to saying that [the
Act] forbids the courts to issue injunctions only when they would
not have the authority to issue them anyway!   It denies any force
whatever to [the Act] except as declaratory of an equitable rule
previously followed by the courts."

revive the evisceration of the Act inherent in *Standard Nut.*

## C

Assuming, *arguendo,* the applicability of § 7421 (a) and *Williams Packing,* petitioner contends that forcing it to meet the standards of those authorities will deny it due process of law in light of the irreparable injury it will suffer pending resort to alternative procedures for review and of the alleged inadequacies of those remedies at law. The Court dismissed out of hand similar contentions nearly 60 years ago,[20] and we find such arguments no more compelling now than then.

This is not a case in which an aggrieved party has no access at all to judicial review. Were that true, our conclusion might well be different. If, as alleged in its complaint, petitioner will have taxable income upon the withdrawal of its § 501 (c)(3) status, it may in accordance with prescribed procedures petition the Tax Court to review the assessment of income taxes. Alternatively, petitioner may pay income taxes, or, in their absence, an installment of FICA or FUTA taxes, exhaust the Service's internal refund procedures, and then bring suit for a refund. These review procedures offer petitioner a full, albeit delayed, opportunity to litigate the legality of the Service's revocation of tax-exempt status and withdrawal of advance assurance of deductibility. See, *e. g., Christian Echoes National Ministry, Inc. v. United States,*

---

[20] See *Dodge* v. *Osborn,* 240 U. S. 118, 122 (1916):

"There is a contention that the provisions requiring an appeal to the Commissioner of Internal Revenue after payment of the taxes and giving a right to sue in case of his refusal to refund are wanting in due process and therefore there is jurisdiction [to issue injunctive relief prior to the assessment or collection of any tax]. But we think it suffices to state that contention to demonstrate its entire want of merit."

470 F. 2d 849 (CA10 1972), cert. denied, 414 U. S. 864 (1973); *Center on Corporate Responsibility, Inc.* v. *Shultz*, 368 F. Supp. 863 (DC 1973).[21]

We do not say that these avenues of review are the best that can be devised. They present serious problems of delay, during which the flow of donations to an organization will be impaired and in some cases perhaps even terminated. But, as the Service notes, some delay may be an inevitable consequence of the fact that disputes between the Service and a party challenging the Service's actions are not susceptible of instant resolution through litigation. And although the congressional restriction to postenforcement review may place an organization claiming tax-exempt status in a precarious financial position, the problems presented do not rise to the level of constitutional infirmities, in light of the powerful governmental interests in protecting the administration of the tax system from premature judicial interference, *e. g., Cheatham* v. *United States*, 92 U. S., at 88–89; *State*

---

[21] Because of the availability of FICA and FUTA refund actions, we need not address the adequacy of another possible means of seeking postenforcement judicial review—the "friendly donor" refund suit. Under this approach, there must be a donor willing to file a refund action claiming a § 170 (c) (2) charitable deduction for a contribution to an organization after the Service has revoked the organization's ruling letter and withdrawn advance assurance of deductibility. To utilize this approach, the organization must first be able to find a donor willing to subject himself to the rigors of litigation against the Service and then must rely on the donor to present the relevant arguments on the organization's behalf. These and other possible differences between a donor refund suit and an action brought directly by an organization leave open the question whether a donor's refund suit constitutes an adequate legal remedy for correcting illegal actions on the part of the Service. We reserve this question for a case that turns upon its resolution.

*Railroad Tax Cases,* 92 U. S., at 613–614, and of the opportunities for review that are available.[22]

## IV

Since we hold that *Williams Packing, supra,* governs this case, the remaining issue is whether petitioner has met the standards of that case. Without deciding the

---

[22] Petitioner did not bring this case as a refund action. Accordingly, we have no occasion to decide whether the Service is correct in asserting that a district court may not issue an injunction in such a suit, but is restricted in any tax case to the issuance of money judgments against the United States. Brief for Respondents 37 n. 35. We note, however, that the Service's position with regard to the range of relief available in a refund suit raises several considerations not presented by a pre-enforcement suit for an injunction. For example, it may be possible to conclude that a suit for a refund is not "for the purpose of restraining the assessment or collection of any tax . . . ," and thus that neither the literal terms nor the principal purpose of § 7421 (a) is applicable. Moreover, such a suit obviously does not clash with what the Court referred to in *Williams Packing, supra,* as a "collateral objective of the Act—protection of the collector from litigation pending a suit for refund." 370 U. S., at 7–8. And there would be serious question about the reasonableness of a system that forced a § 501 (c) (3) organization to bring a series of backward-looking refund suits in order to establish repeatedly the legality of its claim to tax-exempt status and that precluded such an organization from obtaining prospective relief even though it utilized an avenue of review mandated by Congress.

The Service indicates that "its normal practice is to issue a favorable ruling upon the application of an organization which has prevailed in a court suit." Brief for Respondents 35 n. 31, When the Service adheres to that position following a refund suit decided in favor of the plaintiff, there is of course little likelihood that injunctive relief would be necessary or appropriate. But our decision today that § 7421 (a) bars pre-enforcement injunctive suits by organizations claiming § 501 (c) (3) status unless the standards of *Williams Packing* are met should not be interpreted as deciding whether injunctive relief is possible in a refund suit in a district court.

merits, we think that petitioner's First Amendment, due process, and equal protection contentions are sufficiently debatable to foreclose any notion that "under no circumstances could the Government ultimately prevail . . . ." 370 U. S., at 7. See; e. g., *Green* v. *Connally,* 330 F. Supp. 1150 (DC), aff'd *per curiam sub nom. Coit* v. *Green,* 404 U. S. 997 (1971). Accordingly, the Court of Appeals did not err in holding that § 7421 (a) deprived the District Court of jurisdiction to issue the injunctive relief petitioner sought.

In holding that § 7421 (a) blocks the present suit, we are not unaware that Congress has imposed an especially harsh regime on § 501 (c)(3) organizations threatened with loss of tax-exempt status and with withdrawal of advance assurance of deductibility of contributions. A former Commissioner of the Internal Revenue Service has sharply criticized the system applicable to such organizations.[23] The degree of bureaucratic control

---

[23] See Thrower, IRS Is Considering Far Reaching Changes in Ruling on Exempt Organizations, 34 J. Taxation 168 (1971):

"There is no practical possibility of quick judicial appeal at the present. If we deny tax exemption or the benefit to the organization of its donors having the assurance of deductibility of contributions, the organization must either create net taxable income or other tax liability for itself as a litigable issue, or find a donor who as a guinea pig is willing to make a contribution, have it disallowed, and litigate the disallowance. Assuming the readiness of the organization or donor to litigate, the issue under the best of circumstances could hardly come before a court until at least a year after the tax year in which the issue arises. Ordinarily, it would take much longer for the case of the organization's status to be tried. . . . While all of this time is passing, the organization is dormant for lack of contributions and those otherwise interested in its program lose their interest and move on to other organizations blessed with the Internal Revenue Service imprimatur; and the right to judicial review is not pursued.

"This is an extremely unfortunate situation for several reasons. First, it offends my sense of justice for undue delay to be imposed

that, practically speaking, has been placed in the Service over those in petitioner's position is susceptible of abuse, regardless of how conscientiously the Service may attempt to carry out its responsibilities. Specific treatment of not-for-profit organizations to allow them to seek pre-enforcement review may well merit consideration. But this matter is for Congress, which is the appropriate body to weigh the relevant, policy-laden considerations, such as the harshness of the present law, the consequences of an unjustified revocation of § 501 (c)(3) status, the number of organizations in any year threatened with such revocation, the comparability of those organizations to others which rely on the Service's ruling-letter program, and the litigation burden on the Service and the effect on the assessment and collection of federal taxes if the law were to be changed.

The judgment is affirmed.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the decision of this case.

MR. JUSTICE BLACKMUN, concurring in the result.

I concur in the Court's judgment and agree with much of the reasoning in its opinion for this case. As the Court notes, *ante,* at 738, the University's obtaining an injunction would directly prevent the collection of what it says are $750,000 in income taxes for 1971 and of over $500,000 for 1972. On the basis of this fact alone, the "purpose" of the suit is indeed to restrain "the

---

on one who needs a prompt decision. Second, in practical effect it gives a greater finality to IRS decisions than we would want or Congress intended. Third, it inhibits the growth of a body of case law interpretative of the exempt organization provisions that could guide the IRS in its further deliberations."

assessment or collection of [a] tax," and brings 26 U. S. C. § 7421 (a) into play.

Since the anti-injunction statute is applicable, we must consider whether the University comes within the statute's exception recognized in *Enochs* v. *Williams Packing & Navigation Co.*, 370 U. S. 1 (1962). As to this, I join Part IV of the Court's opinion to the effect that it has not been shown that "under no circumstances could the Government ultimately prevail." *Id.*, at 7.