William FITZGERALD, Plaintiff

v.

MOUNTAIN LAUREL RACING INC., Kenneth Marshall, and John Knight, Presiding Judge, Defendants.

No. 78–930 H.

United States District Court, W. D. Pennsylvania.

Jan. 22, 1979.

Sanford S. Finder, Washington, Pa., for plaintiff.

Dale Hershey, Pittsburgh, Pa., for defendants.

## OPINION

DIAMOND, District Judge.

### I

Plaintiff, a harness horse driver and trainer, brought this action under the Civil Rights Act of 1871, 42 U.S.C.A. § 1983, for injunctive relief on the grounds that the defendants violated his right to due process under the Fourteenth Amendment of the United States Constitution when they suspended him from driving and training horses at the Meadows Racetrack in Washington County, Pennsylvania.

Plaintiff's petition for a temporary restraining order was refused and a hearing was held, after which a preliminary injunction was issued by an order which provided in part as follows:

"[T]he court finds that the prerequisites to the issuance of an injunction . . . have been met in this case, to-wit that plaintiff will suffer irreparable harm if the requested relief is not granted; that said harm outweighs any injury that may visit the defendants or the public generally; and that plaintiff has shown a sufficient likelihood of prevailing on the merits of his claim.

". . .

"An opinion with underlying findings of fact and conclusions of law will follow."

The bases for the court's conclusion that the prerequisites to the issuance of the preliminary injunction were met are set forth below.

### II

1. Prior to August 19, 1978, the plaintiff was duly licensed by the Pennsylvania State Harness Racing Commission (Commission) as a trainer of harness racing horses in the Commonwealth of Pennsylvania.

2. At all times pertinent, the defendant Mountain Laurel Racing Inc. (Mountain Laurel) was a racing association incorporated in and under the laws of the Commonwealth of Pennsylvania for the purpose of conducting racing meets at the Meadows Racetrack (Meadows) in Meadowlands, Washington County, Pennsylvania.

3. Defendant Kenneth Marshall was an employee of Mountain Laurel and worked at the Meadows as Racing Secretary at all times pertinent.

4. Defendant John Knight was an employee of Mountain Laurel and worked at the Meadows as Presiding Judge at all times pertinent.

5. On Saturday, August 19, 1978, the plaintiff was informed by defendant Marshall that based on discussions with the track judges Mountain Laurel had decided

to suspend plaintiff from training and driving horses at the Meadows and to expel him from the track because of "inconsistent driving."

6. "Inconsistent driving" is a violation of Rule 18, § 5(c)(2) of the Rules and Regulations of the Commission.

7. Plaintiff received no prior notice of the suspension and was not afforded any hearing.

8. Prior to his suspension plaintiff had eleven horses stabled at the Meadows, which he trained and raced there.

9. Plaintiff was paid by the owners of these horses to stable, board, train, and race them, and both the amount of his compensation as well as his ability to obtain horses for the aforesaid purposes was based, inter alia, on the performance at races at the track of the horses handled by the plaintiff.

10. Plaintiff was unable to transport the aforesaid horses to another track and thereby continue pursuit of his occupation at the time of his suspension because (1) other reasonably accessible tracks had finished their meets, or, (2) plaintiff's horses could not qualify to race in those meets which were still in progress.

### III

In *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917 (3rd Cir., 1974), the court held that the factors which control the issuance of an injunction and which the court must consider and balance are whether:

(1) Plaintiff will suffer irreparable harm if relief is not granted.

(2) The defendant will be harmed if relief is granted.

(3) The public generally will be harmed if relief is granted.

(4) Plaintiff is likely to prevail on the merits of his claim.

We conclude that the plaintiff will suffer irreparable harm if relief is not granted because the nature of his business is such that no adequate remedy exists at law to compensate him for the loss he will sustain if he is unlawfully suspended from driving

at the Meadows. Plaintiff's income as a trainer-driver of harness racing horses is derived from three different sources: (1) a percentage of the purses earned by horses he drives (2) a percentage of the purses earned by horses he trains and (3) a flat fee for the horses he trains. Clearly, the first two sources of income are directly related to the outcome of races in which plaintiff is involved as a driver or trainer. And, to some extent at least, an owner's decision to entrust his horses to plaintiff for training and driving is based upon plaintiff's past success as a trainer, and driver, so that the third source is also somewhat dependent upon plaintiff's success at the finish line. It appears, therefore, that a court or jury in attempting to calculate damages at law for the plaintiff would have to determine how often plaintiff's horses would have been victorious or, at least "finished in the money." Needless to say, this would be a highly speculative endeavor at best, and, at worst, practically an impossible one. *Barchi v. Sarafan*, 436 F.Supp. 775 (S.D.N.Y. 1977). Further, it would be virtually impossible to calculate the ultimate loss to plaintiff's business and reputation from the fact alone that he was suspended from driving at a licensed racetrack for violation of a Commission rule which implies dishonest racing, as we find "inconsistent driving" does.

The second and third factors may be considered together in this case. While the defendants maintain that both their interest and that of the public will be adversely affected if relief is granted because this will cause their patrons' faith in the integrity of harness racing at the Meadows to be eroded, no proof was offered in support of this allegation. Therefore, we cannot find that it exists at all and obviously cannot conclude that it is sufficient to outweigh the substantial harm which plaintiff has shown he will probably suffer.

■ The final factor, namely, the likelihood that plaintiff will prevail on the merits, poses more difficult questions. Plaintiff claims that his expulsion and suspension

constitute a deprivation of his liberty or property rights without due process of law in violation of the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C.A. § 1983. In order to prevail on the merits, plaintiff will have to establish: (1) that he was deprived of a liberty or property interest within the meaning of the Fourteenth Amendment, (2) that the deprivation was without due process, and (3) that the deprivation was done by the state or under color of state law; i. e., that there was "state action."

We first consider whether there was a deprivation of a liberty or property interest within the meaning of those terms in Fourteenth Amendment context. Plaintiff asserts that his right to race and train horses at the Meadows constitutes both a liberty and property interest under the Fourteenth Amendment. The defendants contend that it is neither.

To determine whether or not the right to race and train horses is "property" under the due process clause, this court, following the Supreme Court's direction in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), would have to construe the nature of the right conferred on harness track licensees by the applicable Pennsylvania law, Section 9 of the act of December 22, 1959, P.L. 1978 as amended 1968, July 31, P.L. 857, No. 254, § 1, 15 P.S. § 2609(a). However, it is unnecessary to determine the "property" interest question, since, in our view the injury to plaintiff's reputation resulting from defendants' conduct constitutes the deprivation of a liberty interest.

█ It has long been recognized that the right to one's good reputation may come within the protection of the Fourteenth Amendment, but rulings of the Supreme Court in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); and *Bishop v. Wood, supra*, have made it clear that the right to one's good reputation alone is not sufficient to raise a due-process protection. Rather, there must be a showing of "reputation—

plus;" i. e. that the stigma suffered will, with some degree of probability, lead to the loss of another tangible interest such as employment.

The petitioners in *Roth* and *Paul* were denied relief because they failed to allege and prove that their future employment prospects would be injured. And in *Bishop*, where a police officer was dismissed by a city manager for unsatisfactory performance and an allegation of future injury was made, the Court denied relief because it appeared that the probability of the additional injury materializing was slight in view of the fact that the city manager communicated the reasons for the dismissal to the officer privately and did not publicize them further.

In the instant case, however, the impairment of future business opportunities to the plaintiff as a result of the defendants' acts has been alleged, and, we conclude the likelihood thereof sufficiently proved, because under Rule 23 § 8 of the Commission Rules and Regulations, the fact of plaintiff's expulsion *must* be communicated to the Commission, which in turn *must* communicate it to every racing association in the state of Pennsylvania, which virtually assures that all of plaintiff's potential clients will be aware of it.

█ We next consider the question of due process. Both the plaintiff and defendant Marshall testified that plaintiff's expulsion and suspension on the evening of August 19, 1978, were preceded by neither a hearing nor any notice of charges. While the Supreme Court has on occasion upheld deprivation of liberty or property rights not preceded by notice and hearing, *Dixon v. Lover*, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Bob Jones University v. Simon*, 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974), the presumption is that due process requires a prior hearing unless there exists some extenuating private or public interest of overriding significance that justifies postponement. *Boddie v. Connecticut*, 401 U.S. 371, at 377, 91 S.Ct. 780, 28 L.Ed.2d 113

(1971). Typically, those extenuating circumstances consist of administrative or practical inconvenience. No evidence was offered in the instant case to even suggest that a prior hearing would have been burdensome or for any reason contraindicated by some particular factor or circumstance. In fact, it appears that plaintiff was not even offered a subsequent hearing at the time he first was advised of his suspension—a requirement in those cases which uphold a deprivation without prior hearing because of some overriding private or governmental interest. We conclude, therefore, that plaintiff was not accorded due process.

■ As to the existence of state action, plaintiff contends that his suspension and expulsion from the Meadows was "under color of state law" even though the ousting party was a private racing association instead of the state agency, the Commission itself. In support of this, plaintiff relies primarily on the fact that in Pennsylvania, racing associations, along with the rest of the harness racing industry, are extensively regulated by the state, that the Commission has granted defendant Mountain Laurel a virtual monopoly over racing in a substantial area of the state, and that broad law enforcement powers are delegated to the defendants by statute.

On the other hand, defendants argue that their action was strictly private in character. First, they contend that the expulsion of plaintiff was done under the provisions of an "Application for Stall Space," a type of lease executed by Mountain Laurel and plaintiff which, according to defendants, reserved to Mountain Laurel the right to expel plaintiff from any and all facilities at the Meadows for any reason. Notwithstanding that the reason specified for plaintiff's expulsion and suspension was inconsistent driving, which is a violation of the Rules and Regulations of the Commission, the defendants maintain that their conduct no more had the imprimatur of state involvement than that of any other landlord who evicts an undesirable tenant. The defendants argue, further, that the presence of extensive state regulation and monopoly status are insufficient to convert their otherwise private business and conduct into state action, and cite *Jackson v. Metropolitan Edison Company*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) in support of this.

In *Jackson* the Court found that no state action was involved where a Pennsylvania utility company terminated service to a customer without prior notice and hearing. The fact that the state may have conferred monopoly status upon defendant was found to be insufficient to support a finding of state action since there was insufficient relationship between the challenged action of the entity involved and its monopoly status. 419 U.S. at p. 352, 95 S.Ct. 449. The court concluded that in the absence of a closer nexus between the state and the challenged activity, the fact of extensive state regulation would not in itself convert the utility's action into that of the state and even though the utility did submit a broad tariff to the state containing a provision explaining the utility's termination rights, it could not be said that the State "authorized and approved" the practice, since the provision was given minimal scrutiny at best. 419 U.S. at pp. 354–5, 95 S.Ct. 449.

We believe that "state action" was present in the instant case and that this conclusion is consistent with *Jackson*. Pennsylvania's relationship with private racing associations appears to be decidedly more "symbiotic," *Jackson, supra*, 419 U.S. at p. 357, 95 S.Ct. 449, than it is with public utilities. We note, for example, that under Rule 26 § 11 of the Commission's Rules and Regulations, racetrack judges, who are employees of the racing associations and not of the state and who were the persons at whose suggestion plaintiff was suspended are expressly empowered to enforce Commission rules governing the conduct of those directly involved in race meets; e. g., drivers, trainers, owners, employees of the racetrack.

Further, under Pennsylvania law, 15 P.S. § 2610.1, broad powers are conferred on racing associations to regulate the conduct of patrons of the track, including the right

to employ security personnel with the "powers and duties of a peace officer" to enforce the criminal laws of the Commonwealth within the race meeting grounds or enclosure. They also are given the right to eject from the track any person whose presence is in their "sole judgment" inconsistent with the best interest of harness racing, and one so ejected is subject to fine or imprisonment if subsequently found at the track.[1] In these matters, racing associations and their employees are not only acting as *agents* of the state but as *deputies* thereof. And certainly nothing is more uniquely "state action," then the enforcement of its criminal laws.

Unlike *Jackson*, the state here *has specifically approved and authorized suspensions of racing related privileges by private persons*, and, in fact, has completely delegated this authority. Furthermore, to the extent that the deputizing of privately-employed persons obviates the need of the Commission to hire additional enforcement personnel, the state has placed itself in the position of interdependence that the Court found absent in *Jackson*, 419 U.S. at pp. 357–8, 95 S.Ct. 449, but deemed controlling in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

As previously noted, the defendant Marshall testified that plaintiff was suspended because defendants felt that he had violated Commission Rule 18 § 5(c)(2) dealing with inconsistent driving, and, of course, the state has authorized such private persons to enforce Commission rules. The defendants maintain, nevertheless, that they expelled and suspended plaintiff by authority of the eviction clause in the lease for stall space. The parties agreed, however, that rental of stall space was not a prerequisite to *driving* and *training* horses at the Meadows and that many active drivers and trainers there keep their horses at stalls not controlled by Mountain Laurel. So, defendants, while claiming to have acted under a contractual right to evict plaintiff from *stalls and facilities he rented*, cited Commission rule violations when they acted, went far beyond a simple eviction from rented space, and now seek to prevent injunctive relief by citing the harm which will result if plaintiff is permitted to continue *driving* horses at the Meadows, a right not at all dependent on the rental of stall space.

It is clear to us, therefore, that plaintiff was suspended and evicted for allegedly violating a rule of the Pennsylvania State Harness Commission, an agency of the Commonwealth of Pennsylvania, that the defendants were specifically authorized by the state to enforce this rule, and that the asserted concurrent basis of private authority neither attenuates nor mitigates these facts.

Finally, defendants argue that notwithstanding any other consideration, plaintiff's claim will fail on the merits because he did

---

1. For convenience, we set forth 15 P.S. 2610.1 in its entirety.

§ 2610.1 *Security personnel; powers and duties*

The State Harness Racing Commission and any association licensed by the commission is hereby authorized and empowered to employ persons as security personnel. *These persons shall possess the powers and duties of a peace officer with respect to the enforcement of the criminal laws of the Commonwealth within the race meeting grounds or enclosure.* Such designated persons are also authorized and empowered to interrogate and eject from the race meeting grounds or enclosure any persons suspected of violating any rule or regulation promulgated by the State Harness Racing Commission. The State Harness Racing Commission and any association licensed by the commission may refuse admission to and eject from enclosure of the race track operated by any association, any person whose presence there is, in the sole judgment of the association or commission, inconsistent with the orderly or proper conduct of a race meeting or whose presence or conduct is deemed detrimental to the best interest of harness racing. A person so refused admission or so ejected shall have all rights of appeal provided for under this act. A licensee may not refuse admission to or eject a law enforcement official. A person found within a race track enclosure after having been refused admission thereto or ejected therefrom shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine not exceeding one thousand dollars ($1000) or undergo imprisonment for a term not exceeding six months, or both. (Emphasis supplied)

not exhaust his administrative remedies as he was required to do as a prerequisite to this suit. We disagree. See *U. S. ex rel. Ricketts v. Lightcap*, 567 F.2d 1226, 1229 (3rd Cir., 1977).

We conclude, accordingly, that plaintiff has demonstrated sufficient likelihood of prevailing on the merits.

The foregoing discussion of the merits of plaintiff's claim is, of course, not a final determination. As previously stated, a petitioner seeking preliminary injunctive relief need only show a *likelihood* of prevailing on the merits. And it is well settled that the degree of likelihood a court should require will vary depending upon the relative injury faced by the interested parties. See cases listed by *Wright and Miller*, Federal Practice and Procedure, at Volume II, Page 453, n. 60. In this case the balance of harm weighs decidedly in plaintiff's favor. Thus, while it may be that at a trial on the merits, should one be had, plaintiff will actually fail to establish his case, the court believes that a sufficient showing of probable success has been made at this time.