**VALLEY BANK OF NEVADA, a Nevada banking corporation, Plaintiff,**

v.

**CITY OF HENDERSON, a political subdivision of the State of Nevada, Defendant and Counterclaimant,**

v.

**UNITED STATES of America and Valley Bank of Nevada, a Nevada banking corporation, Harry Polk, Bentonite, Inc., and Stage Construction Company, Counterdefendants.**

No. CIV–LV–79–149, HEC.

United States District Court,
D. Nevada.

Dec. 21, 1981.

Will Kemp, Jones, Jones, Bell, Close & Brown, Las Vegas, Nev., for plaintiff.

John Marchiano, Henderson, Nev., for defendant City of Henderson.

V. Devoe Heaton, Las Vegas, Nev., for defendants Polk, Bentonite, Inc. and Stage Const.

Barry Lieberman, Tax Div., Dept. of Justice, Washington, D.C., for counterdefendant United States.

## DECISION

CLAIBORNE, Chief Judge.

The trial of the above-captioned case was held before the Court on November 20, 1981.

Prior to the trial, on April 7, 1981, this Court granted the Motion of the United States to Amend the Pretrial Order filed in this case to add as an issue of law: Whether a federal tax lien against Bentonite, Inc. on October 25, 1974, is entitled to priority over the claims of Valley Bank of Nevada and/or City of Henderson.

Most of the facts in this case are not in dispute.

On October 13, 1969, a Water Refunding Agreement dated September 9, 1969, (between the City of Henderson and Bentonite, Inc. and Stage Construction Company) and all proceeds therefrom were pledged and assigned to the Nevada National Bank. The Water Refunding Agreement was based on the City of Henderson Municipal Code which provides that the cost of the water mains installed by a subdivider such as Bentonite, Inc. will be repaid to the subdivider on a quarterly basis upon payment of the connection fees by customers. The Pledge and Assignment provided that the proceeds were to be used as "collateral" to secure a loan. A copy of the Pledge and Assignment was not filed with the Secretary of the State of Nevada.

On May 24, 1972, Harry W. Polk, for himself, Bentonite, Inc., State Construction Company, and Henderson Trailer Estates executed an agreement assigning to Valley Bank of Nevada certain rights which Polk was in the process of negotiating, or had been negotiated with the City of Henderson. The agreements, which were apparently the subject of the assignments, were not entered into until January 2, 1973. These agreements, which cover water and sewer refunding agreements, are similar to the Water Refunding Agreement previously discussed. Notice of the assignment of these agreements has never been filed with the Secretary of State of the State of Nevada. No specific testimony concerning the amount of the loan in exchange for the assignment of the refunding agreements was presented other than the testimony of a bank official, Ted Golam, that a consolidation of already outstanding loans took place in connection with the assignments. According to stipulation by the parties, the City of Henderson is currently indebted to Bentonite, Inc. and Stage Construction Company, Inc. (a wholly owned subsidiary of Bentonite) in the sum of $24,828.72, pursuant to the Water and Sewer Refunding Agreements previously discussed.

On April 16, 1974, Nevada National Bank assigned the Water Refunding Agreement dated September 9, 1969, to Valley Bank of Nevada. Concurrently, Polk executed an Instrument of Assignment to Valley Bank, assigning the same water refunding agreement as "collateral of outstanding notes."

On June 24, 1974, the Tax Court entered orders of dismissal in two cases involving Bentonite. In *Bentonite, Inc. v. Commissioner*, No. 2450–67, the court upheld a deficiency of $61,851.92 against Bentonite, Inc., for the fiscal year ending June 30, 1963. In *Bentonite, Inc.·v. Commissioner*, No. 793–68, the court upheld a deficiency of $12,-446.91 for the fiscal year ending June 30, 1964. Pursuant to these decisions, the Commissioner made assessments of $103,232 and $20,005.93 against Bentonite, Inc., for the years 1963 and 1964 on October 25, 1974, and October 29, 1974, respectively. A Notice of Federal Tax Lien covering these assessments was filed with the Secretary of State on March 6, 1975. On July 29, 1980, a Notice of Levy was served upon the City of Henderson demanding the funds being held by the city for the account of Bentonite, Inc.

In 1976, Harry Polk was convicted of a violation of Section 7215 of the Internal Revenue Code of 1954 for his failure to collect, account for, and pay over income and FICA taxes withheld from the pay of his employees. Polk was sentenced to one year in jail and fined. On July 3, 1977, a hearing was held upon Polk's motion to modify his sentence. As a condition of vacating the prison sentence given to Polk,

Judge Thompson ordered Polk to pay $35,-000 to the United States in delinquent tax obligations. The $35,000 figure was an approximation of the employment taxes owed by Polk without taking into account any accrued penalties and interest on the amounts due and owing. On August 5, 1977, Polk delivered to the Clerk of the Court a cashier's check for $35,000 payable to the Internal Revenue Service. The Court noted that "the Internal Revenue Service is authorized to apply that payment to taxes of any kind due from the defendant to the Internal Revenue Service." The payments made by Polk have been fully accredited to his account.

Originally, the United States sought to enforce its tax assessments against Harry Polk in the interpleader action on the theory that Polk, Bentonite, Inc. and Stage Construction Company are merely alter egos of one another. While the Court finds ample evidence to support this contention, the Government has essentially dropped this argument and now pursues the position that the tax liens arising as a result of the $103,232 assessment against Bentonite, Inc. on October 25, 1974, and the $20,005.93 assessment against Bentonite Inc. on October 29, 1974, are entitled to priority over the unperfected and inchoate interests of each of the other claimants to the interpleader fund.

## DID THE TAX LIENS OF THE UNITED STATES AGAINST BENTONITE, INC. GIVE THE UNITED STATES PRIORITY OVER THE OTHER CLAIMANTS TO THE INTERPLEADER FUNDS?

The question of when a federal tax lien has priority over a security interest created under state law must be answered by reference to federal law. *Aquilino v. United States*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); *Dugan v. Missouri Neon and Plastic Advertising Company*, 472 F.2d 944, 949 (8th Cir. 1973); *Nevada Rock and Sand Company v. United States*, 376 F.Supp. 161, 163 (D.Nev.1974).

While some have characterized the subject of federal tax liens as being somewhat complex,[1] the complexities of this area of law fade if a step by step analysis is made as to the question of who has priority over the fund in issue.

The initial premise, not challenged by any of the parties to this action, is that the United States acquires a lien against all property and rights to property belonging to a taxpayer upon the assessment of unpaid taxes and notice of demand for payment of same being made upon taxpayer. Section 6321 of the Internal Revenue Code of 1954 provides:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

Section 6322 of the Code provides:

> Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time.

Here the United States obtained liens against Bentonite, Inc., on October 25, 1974, and October 29, 1974.

These liens immediately attached to all property or rights to property belonging to Bentonite, Inc. However, this lien was not valid against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until March 6, 1975, when a Notice of Federal Tax Lien was filed with the Secretary of State. See Code Section 6323(a) and (f); Nevada Revised Statute Section 108.827; *Bank of Nevada v. United States*, 251 F.2d 820, 826 (9th Cir. 1957), *cert. denied*, 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813 (1958).

---

1. See e.g. *Randall v. Nakashima*, 542 F.2d 270 (5th Cir. 1976).

## DID BENTONITE, INC. HAVE PROPERTY RIGHTS TO PROPERTY IN THE REFUNDING AGREEMENT WHEN THE FEDERAL TAX LIENS ATTACHED?

■ Valley Bank argues that Bentonite, Inc. had no property or property rights in the refunding agreement at the time the tax liens attached in October, 1974, because it had already assigned its rights to Valley Bank of Nevada. The same factual situation arose in *Nevada Rock and Sand Company v. United States, supra*, where the assignee was to receive the proceeds from the contract rights directly, instead of through the assignor. The same argument was made that there did not exist a property right to which a tax lien could attach since the assignor had assigned its interest. The court firmly rejected this argument and held that there was an interest to which the tax lien could attach.

While the language of the May 24, 1972, "Assignment" could indicate an outright sale, the circumstances surrounding the assignment, the understanding of the parties and the subsequent conduct of the parties manifest the reality of the transaction as a financing arrangement where the agreement was used as collateral. *Major's Furniture Mart v. Castle Credit Corp.*, 602 F.2d 538, 543 (3rd Cir. 1979); *In re Joseph Kanner Hat Co., Inc.*, 482 F.2d 937, 940 (2nd Cir. 1973).

## DID VALLEY BANK QUALIFY AS A "HOLDER OF A SECURITY INTEREST" UNDER SECTION 6323 OF THE CODE AND NOT ENTITLED TO PRIORITY OVER THE UNITED STATES?

As noted previously, a tax lien attaches to all property or rights to property of a taxpayer at the moment when an assessment is made. See *Bank of Nevada v. United States, supra*, 251 F.2d at 826; *Nevada Rock and Sand Company v. United States, supra*, 376 F.Supp. at 163 n. 1. That is not to say, however, that a creditor of the taxpayer cannot obtain priority over the United States after the lien has arisen. The "blueprint" on how to obtain priority is contained in Section 6323(a) of the Code which provides:

> The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary.[2]

Here the Notice of Lien was filed on March 6, 1975. Thus, the question is whether Valley Bank or any of the other parties to this action qualified as a "holder of a security interest" prior to March 6, 1975.[3] A holder of a security interest is defined in Section 6323(h) of the Code as follows:

> (1) *Security Interest.*—The term "security interest" means any interest in property acquired by contract for the purpose of

**2.** Prior to 1966, Section 6323 provided that mortgages, pledges, purchasers, and judgment creditors were entitled to priority over unfiled federal tax liens. In 1966, Congress amended the section and included holders of security interests, which covers others than mortgagees and pledgees, among the classes of persons entitled to prevail over unfiled federal tax liens. One of the major purposes of the revision was to harmonize the provisions of the Internal Revenue Code with the provisions of the Uniform Commercial Code. As the Senate Committee Report states (S.Rep.No.1708, 89th Cong., 2d Sess., p. 2 (1966–2 Cum.Bull. 876) U.S.Code Cong. & Admin.News, 1966, p. 3722—

> This bill is in part an attempt to conform the lien provisions of the internal revenue laws to the concepts developed in the Uniform Commercial Code. It represents an effort to

adjust the provisions in the internal revenue laws relating to the collection of taxes of delinquent persons to the more recent developments in commercial practice (permitted and protected under State law) and to deal with a multitude of technical problems which have arisen over the past 50 years.

Congress did not, however, extend priority to all persons asserting security interests under local law, but, rather, limited the class to those persons who had taken steps under local law to protect their interests. *United States v. Trigg*, 465 F.2d 1264, 1269–1270 (8th Cir. 1972), *cert. denied*, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973).

**3.** There is no claim by any of the parties to this action that they should be classified as purchasers, mechanic's lienors, or judgment lien creditors.

securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.

The Water Refunding Agreement was assigned to Valley Bank on July 16, 1974. The remaining Water and Sewer Refunding Agreements were assigned to Valley Bank on May 24, 1972, (although the bank's security interest in these agreements did not "attach" until January 2, 1973). See N.R.S. Section 104.9203(1)(c).[4]

The interest obtained by Valley Bank via these assignments, however, was not a security interest within the meaning of Section 6323(h)(1), inasmuch as its rights were not protected under local law against a judgment lien arising out of an unsecured obligation.

■ To obtain a "security interest" sufficient to defeat an unfiled federal tax lien, the creditor must perfect its security interest against a hypothetical judgment lien creditor prior to the time the United States files a Notice of a Federal Tax Lien. N.R.S. Section 104.9301(1)(b), (d). *Dragstrem v. Obermeyer*, 549 F.2d 20, 25–26 (7th Cir. 1977); *United States v. Trigg, supra*, 465 F.2d at 1269–1270; *George W. Ultch Lumber Co. v. Hall Plastering, Inc.*, 477 F.Supp. 1060, 1071 (W.D.Mo.1979); *United States v. Sterling National Bank and Trust Co.*, 360 F.Supp. 917, 925 (S.D.N.Y.1973)

*modified on other grounds*, 494 F.2d 919 (2nd Cir. 1974). *Contra, Nevada Rock and Sand Company v. United States, supra*, 376 F.Supp. at 172 n. 17; *United States v. Ed Lusk Construction Company, Inc.*, 504 F.2d 328, 331 (10th Cir. 1974).[5]

**WERE THE FINANCING TRANSACTIONS ENGAGED IN BY VALLEY BANK WITHIN THE SCOPE OF ARTICLE NINE?**

■ Valley Bank has argued that the assignments of the water and sewer refunding agreements do not fall within the scope of Article Nine of the Uniform Commercial Code and therefore, no perfection of the assignments by filing is required. This argument is totally without merit for a number of reasons.

Article 9 (N.R.S. Section 104.9101 *et seq.*) applies to any transaction which is intended to create a security interest in accounts and to any sale of accounts. N.R.S. Section 104.9102. The inclusion of outright sales of accounts within the scope of Article 9 was attributable to the fact that the distinction between a security transfer of an account or contract right and a sale of that account or contract right was often blurred. See Official Comment 2 to U.C.C. Section 9–102; *George W. Ultch Lumber Company v. Hall Plastering, Inc., supra*, 477 F.Supp. at 1065–1066; Comment, *Assignment of Accounts and Contract Rights*, 1977 Utah L.Rev. 311, 333–334; 1 Bender's Uniform Commercial Code Service, *Secured Transactions* § 5A.08[1] (1980).

**4.** The Uniform Commercial Code was originally enacted in Nevada in 1965. That version was commonly referred to as the 1962 Code. In 1973, the Nevada legislature amended the Code to conform Nevada law with the 1972 Code version of the Uniform Commercial Code. The amendments, as they pertain to this case, are not significant. All references to Nevada Revised Statutes Sec. 104.9101 *et seq.* will be to the 1972 version of the Uniform Commercial Code, as amended.

**5.** In addition, it does not matter whether the "hypothetical lien creditor test" or the "subjective knowledge lien creditor test" is used, since

there has been no evidence introduced that the Internal Revenue Service had knowledge of Valley Bank's security interests when the liens were acquired on October 25, 1974, and October 29, 1974. Compare *Dragstrem v. Obermeyer, supra*, 549 F.2d at 25–26 with *Nevada Rock and Sand Co. v. United States, supra*, 376 F.Supp. at 172 n. 17. Contrary to Valley Bank's assertion at trial, the knowledge of the United States under this test is measured at the time it became a lien creditor against Bentonite, Inc. Such event occurred on October 25, 1974, not on the date of levy on July 29, 1980, as discussed.

N.R.S. Section 104.9104(6) removes certain transactions from the scope of Article Nine.[6] All the transactions removed, however, are outright transfers of accounts. In connection with the discussion of whether Bentonite had property or rights to property in the refunding agreements, the assignments involved here were never intended to be outright transfers, but, rather, were intended to provide Valley Bank with collateral to secure its loan. Indeed, in excluding from the U.C.C. "a transfer of a right to payment under a contract to an assignee who is also to do the performance under the contract," NRS 104.9104(6) illustrates that an assignment under which the payment of an outstanding loan is effectuated by a direct payment from the debtor to the assignee is within the scope of Article 9 where the assignee is not obligated to do the performance under the contract.[7] Here, Valley Bank is in no way required to perform under the refunding agreements. See also Official Comment 6 to U.C.C. Section 9–104 which provides:

> In general sales as well as security transfers of accounts and chattel paper are within the Article (see Section 9–102). Paragraph (f) [N.R.S. Sec. 104.9104(6)] excludes from the Article certain transfers of such intangibles which, by their nature, *have nothing to do with commercial financing transactions.* (Emphasis added.)

Thus, Valley Bank's reliance on N.R.S. 104.-9104(6) and the cases of *Spurlin v. Sloan,* 368 S.W.2d 314 (Ky.Ct.App.1963) and *Lyon v. Ty-Wood Corporation,* 212 Pa.Super. 69, 239 A.2d 819 (1968) is misplaced.[8] See *George W. Ultch Lumber Company v. Hall Plastering, supra,* 477 F.Supp. at 1066; *Consolidated Film Industries v. United States,* 403 F.Supp. 1279, 1281–1282 (D.Utah, 1975), *rev'd on other grounds,* 547 F.2d 533 (10th Cir. 1977); *United States v. Damrow,* 211 F.Supp. 615, 618 (D.Wyo. 1962).

## ARE EQUITABLE LIENS INCHOATE LIENS AND NOT VALID AGAINST PERFECTED FEDERAL TAX LIENS?

The federal rule "first in time first in right" determines whether a federal tax lien under § 6321, Title 26, United States Code or a competing lien created by state law has priority. *United States v. City of New Britain,* 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954).

Under this basic federal priority standard, a federal tax lien takes priority over a state-created lien unless the state lien is specific and perfected in the federal sense. *United States v. Crest Finance Co.,* 302 F.2d 568, 569 (7th Cir. 1962), on remand from 368 U.S. 347, 82 S.Ct. 384, 7 L.Ed.2d 342 (1961); *United States v. Trigg, supra,* 465 F.2d at 1269.

As part of this rule, the Supreme Court has announced that a state of local lien must be "choate" to defeat the federal lien. This is referred to as the doctrine of choateness. *United States v. City of New Britain, supra.* In order for a state of local lien to be "choate" it must meet the three tests of (1) certainty of the lienor, (2) certainty of the property subject to the lien,

---

**6.** N.R.S. 104.9104(6) provides that:

Transactions excluded from article. This article does not apply:

> .   .   .   .   .

6. To a sale of accounts or chattel paper as part of a sale of the business out of which they arose, or an assignment of accounts or chattel paper which if for the purpose of collection only, or a transfer or a right to payment under a contract to an assignee who is also to do the performance under the contract or a transfer of a single account to an assignee in whole or in partial satisfaction of a preexisting indebtedness . . .

**7.** When accounts receivable financing is involved, it is, of course, not abnormal to have payments from account debtors go directly to a bank. Under such circumstances a bank could not claim that the transaction was outside the scope of Article 9.

**8.** Both *Spurlin* and *Lyon* specifically held that the transactions at issue were absolute assignments and not security transactions. See also *Sherburne Corp. v. Carter,* 340 A.2d 82, 17 U.C.C. Rptg.Serv. 523, 526 (Sup.Ct.Vt.) (Bank's failure to file financing statement with respect to accounts assigned to it in light of its "professional status" allowed subsequent lienholder to obtain priority status.)

and (3) certainty of the amount of the lien. *Id.* In addition, the Supreme Court has indicated that in order to be choate, the state of local lien must also be enforceable summarily without the necessity of a judicial proceeding. *United States v. Vermont,* 377 U.S. 351, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964), *United States v. Security Trust & Savings Bank,* 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950).

In *Bank of Nevada v. United States, supra,* 251 F.2d at 823–824, the Ninth Circuit specifically rejected a contention by the appellant bank that an equitable lien held by the bank in the form of a right of set-off could prime a federal tax lien. Thus, in this Circuit, the rule espoused in *Morrison Flying Service v. Deming National Bank,* 404 F.2d 856 (10th Cir. 1968), *cert. denied,* 393 U.S. 1020, 89 S.Ct. 628, 21 L.Ed.2d 565 (1969) and relied upon by Valley Bank is clearly not followed.[9] See also *United States v. Morrison,* 247 F.2d 285 (5th Cir. 1957), *First National Bank of Cartersville v. Hill,* 412 F.Supp. 422, 424 (N.D.Ga.1976).

## IS N.R.S. 104.9302(1)(e) INAPPLICABLE WHERE AN ASSIGNMENT IS FOR COLLATERAL?

■ Plaintiff's claims that Valley Bank's interest in the refunding agreements was perfected without filing because N.R.S. 104.9302(1)(e) exempts these transactions from the filing requirements of that Section are untenable.

At the time the tax liens attached in October, 1974, N.R.S. 104.9302(1)(e) provided:

(1) A financing statement must be filed to perfect all security interests except the following:

. . . . .

(e) an assignment of accounts which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts of the assignor;

It is significant to note that Comment 5 to this section of the Uniform Commercial Code provides in pertinent part:

The purpose of the subsection (1)(e) exemptions is to save from *ex post facto* invalidation casual or isolated assignments: some accounts receivable statutes have been so broadly drafted that all assignments, whatever their character or purpose, fall within their filing provisions. Under such statutes many assignments which no one would think of filing may be subject to invalidation. The subsection (1)(e) exemptions go to that type of assignment. *Any person who regularly takes assignments of any debtor's accounts should file.* In this connection, Section 9–104(f) which excludes certain transfers of accounts and contract rights from the Article should be consulted. (Emphasis added).

Professor Gilmore, who was a reporter for Article 9, has stated that U.C.C. § 9–302(1)(e) was "carefully drafted so that no assignee, engaged in a regular course of financing, will ever be tempted to rely on it in order to avoid a filing which ought to be made." 1 G. Gilmore, *Security Interests in Personal Property,* § 19.6 at p. 538 (1965). [Hereinafter cited as *Gilmore.*]

N.R.S. Section 104.9302(1)(e) was never intended to provide an escape hatch for negligent institutional financiers. This section is applicable only when an outright sale of an account occurs, or the security interest is granted to an assignee who is not regularly engaged in financing activities. See e.g., *Gilmore, supra,* p. 538 (the "beneficent purpose" of U.C.C. § 9–302(1)(e) was to protect "assignees who are both insignificant and ignorant."

## IS KNOWLEDGE BY THE UNITED STATES OF ANY PRIOR INTEREST BY VALLEY BANK OF NEVADA IRRELEVANT?

■ As noted in footnote four of this decision, the Uniform Commercial Code was

---

**9.** The decision in *Morrison Flying Service* was made without any discussion of the choateness doctrine. Moreover, it appears that the subcontractor in whose favor the decision was entered *could not* perfect his lien. Such is clearly not the case here, since there is no dispute that Valley Bank could easily have perfected its security interest in this case.

enacted in 1965. That version had Section 9–301(1)(b), which was adopted verbatim by the Nevada Legislature, as follows:

(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of . . .

(b) a person who becomes a lien creditor without knowledge of the security interest and before it is perfected.

The Nevada Legislature amended the Code to conform Nevada Law with the 1972 version of the Uniform Commercial Code. The amended version was adopted in 1973 and reads as follows:

(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of . . .

(b) a person who becomes a lien creditor before the security interest is perfected.

The *Nevada Rock and Sand Company* case was decided in 1974, but the facts of the case occurred in 1971 under the old version of N.R.S. 104.9301(1)(b) which required that the lien creditor acquire the interest without knowledge of any other security interest. This explains footnote 17 of *Nevada Rock and Sand Company v. United States, supra,* 376 F.Supp. at 172 n. 17, which states:

It should be noted that the IRS is entitled to priority over the unrecorded assignment only if it became a lien creditor *without knowledge* of the assignment. N.R.S. 104.9301(1)(b). . . .

The facts before this Court occurred after the adoption of the new version of N.R.S. 104.9301(1)(b) which does not have a "no-knowledge requirement." The official reasons for the change in the Uniform Commercial Code are stated in the comments of Appendix II for 9–301, as follows:

Paragraph (1)(b) has been amended to eliminate the element of knowledge in the conditions under which a lien creditor may defeat an unperfected interest. Knowledge of the security interest will no longer subordinate the lien creditor to the unfiled security interest. The former section denied the lien creditor priority even though he had no knowledge when he got involved in extending credit, if he acquired knowledge while attempting to extricate himself. It is completely inconsistent in spirit with the rules of priority between security interests, where knowledge plays a very minor role.

Therefore, knowledge on the part of the Government with respect to Valley Bank of Nevada's interest is irrelevant under N.R.S. 104.9301(1)(b).

## ARE THE LIENS OF THE UNITED STATES AGAINST BENTONITE, INC. VALID?

██ Both the Valley Bank and Bentonite, Inc. claim that the liens against Bentonite, Inc. arising on October 25, 1974 and October 29, 1974, have lapsed and are therefore invalid. This contention is also untenable.

Section 6502(a) of the Code provides in pertinent part:

*Length of Period.*—Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by proceeding in court, but only if the levy is made or the proceeding begun—

(1) within 6 years after the assessment of the tax.

On July 29, 1980, within the six year period provided for in the statute, the Internal Revenue Service levied upon the City of Henderson with respect to the tax assessments against Bentonite, Inc.

Both the Valley Bank and Bentonite, Inc. erroneously argue that the levy is somehow to be considered the filing of a lien. This position has absolutely no foundation in law. This Court differentiates between the attachment of the liens (which occurred in October, 1974) and the administrative procedure of levying upon the debtor. The latter event merely permits the Internal Revenue Service to preserve its lien with respect to any funds due from the City of Henderson to Bentonite, Inc., pursuant to any agreements between the City and Bentonite as of the date of the levy. The former event provides the key date for de-

**916**

termining priority issues, along with the March 6, 1975 date of the filing of the notice of these tax liens.

Moreover, the institution of this action and the demand that the interpleaded funds be turned over to the United States set forth in the Government's answer served on July 23, 1979, satisfies the requirement in Section 6502(a) that the tax may be collected by a proceeding begun within six years after the assessment of the tax.

## CONCLUSION

■ The City of Henderson holds certain sums for the account of Bentonite, Inc. pursuant to the six water and sewer refunding agreements. At trial, the City of Henderson has abandoned its claim to any of the proceeds of the fund in issue. The United States and Valley Bank are not the only two claimants to the fund. However, the only party to have a perfected lien on this fund is the United States. Valley Bank could have perfected its security interest arising from the assignments of the water and sewer refunding agreements. All it had to do was to file a financing statement covering these assignments with the Secretary of State of the State of Nevada prior to March 6, 1975. N.R.S. Section 104.9401. Failing to have taken this simple step, Valley Bank cannot now claim priority to the interpleaded fund. *George W. Ultch Lumber Company v. Hall Plastering, Inc.,* supra, 477 F.Supp. at 1071; *United States v. Trigg,* supra, 465 F.2d at 1270; *Nevada Rock and Sand Company v. United States,* supra.

IT IS HEREBY ORDERED that the Government shall submit proposed Findings of Fact, Conclusions of Law and Judgment consistent with this Decision.