**Evelyn G. KETCHAM, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CV–N–91–47–ECR.**

United States District Court, D. Nevada.

Aug. 27, 1991.

---

**512**

Thomas A. Collins, Reno, Nev., for plaintiff.

Leland E. Lutfy, U.S. Atty., Reno, Nev., Mark G. Fraase, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

### ORDER

EDWARD C. REED, Jr., Chief Judge.

Plaintiff, Evelyn Ketcham, moves the Court for issuance of a preliminary injunction to prohibit the I.R.S. from levying on certain assets pursuant to a levy served on Western Title Company, Inc., on May 16, 1991. An evidentiary hearing was held before the court on May 24, 1991. At that time the court also heard the arguments of counsel and received legal authority in support of the parties respective positions.

This action is brought pursuant to 26 U.S.C. § 7426. Section 7426(b)(1) provides the District Court with jurisdiction to grant an injunction against an I.R.S. levy if such levy would irreparably injure rights in property which the court determines to be superior to the rights of the United States in such property.

### I. STATEMENT OF FACTS

The levy in this case was issued on the basis of a notice of federal tax lien for taxes owed by plaintiff's former husband, Charles J. Ketcham, for the year 1979. The notice of lien was recorded on September 30, 1985. This court must decide whether the assets sought to be levied upon belonged to plaintiff prior to recordation of the notice of lien. This issue in turn depends on whether a legally effective assignment of this property from Mr. Ketcham to plaintiff was perfected prior to the date of September 30, 1985, when the lien was filed.

Plaintiff and Charles J. Ketcham were married in 1955 and divorced in 1963 in Las Vegas, Nevada. There were three children born the issue of the marriage. Plaintiff and Mr. Ketcham both testified at the hearing that as a part of the divorce settlement Mr. Ketcham was obligated to pay Mrs. Ketcham the sum of $1,000,000 and that this sum was paid soon after the divorce proceedings were concluded in the form of four cashier's checks, each in the sum of $250,000. Corroborating evidence for these assertions is indeed sketchy at best. The only evidence that such a debt arose from the divorce was the testimony of Mike Furbush, Senior Vice President of Valley Bank in Reno. He testified that in March of 1988, at the time Valley Bank was set to reconvey certain security (as will be further discussed below) which had been posted by Eagles Nest Limited Partnership with the bank, Mr. Ketcham had shown him what was described as a settlement agreement with plaintiff. The settlement agreement was shown to Mr. Furbush in support of a request that the secured property to be reconveyed be transferred by the bank directly to plaintiff. Mr. Furbush did not testify in any detail as to the contents of the settlement agreement but in the context of the hearing it may be inferred that it was the agreement to pay the $1,000,000.

Mr. Furbush also testified that the settlement agreement was in such form that he could have relied on it in reconveying the security, but that bank policy was to reconvey secured property to the original borrower (Eagles Nest) and that he was obligated to follow that policy and did so. While the plaintiff and her former husband, Mr. Ketcham, have a considerable interest in the outcome of these proceed-

ings, Mr. Furbush does not and the court accepts his testimony that a settlement agreement did exist.

No copies of the divorce decree or any related settlement agreement or copies of the alleged cashier's checks were introduced in evidence. The suggestion that no such settlement agreement existed is certainly raised by that fact, but Mr. Furbush's testimony tilts the scales in favor of finding that such an agreement did exist.

The testimony of plaintiff and Mr. Ketcham (hereinafter "the Ketchams") was that Mrs. Ketcham did not negotiate any of the four cashier's checks used in paying the settlement, but instead retained them in a closet at her home. Thereafter, according to the Ketchams, Mr. Ketcham, in need of funds for business purposes borrowed the million dollars back from his ex-wife over a period of two to three years. These loans were supposedly made on four occasions when plaintiff simply endorsed, in each case, one of the cashier's checks and delivered it to Mr. Ketcham. There were no papers or documents prepared to evidence the loans of these very large sums of money. There were no terms of repayment established between the parties or security given, or provision for payment of interest.

In 1978, the limited partnership known as Eagles Nest Limited Partnership (sometimes referred to hereinafter simply as Eagles Nest) was formed in connection with a condominium project in Washoe County, Nevada. Mr. Ketcham was the general partner of the partnership and there were five limited partners.

Mr. Ketcham testified that within ninety days after the formation of the partnership (which would have to be sometime in the year 1978) he assigned his interest in "the ultimate proceeds" he might eventually derive from the partnership to his former wife in repayment of the million dollar loan. He testified that there was written documentation to evidence the assignment, but that after a diligent search it cannot be found. Mr. Ketcham is a very sophisticated businessman who has constantly received the advice of attorneys and accountants. He had a net worth in 1980 of over $30,000,000. He is the sort of person who would have documented such a transaction, or had it done, and who would have retained the documentation. There is some serious question as to whether this assignment ever took place. Mr. Ketcham states that his house counsel, Joseph Montero, of Las Vegas, Nevada, prepared the draft assignment that was used and that it was signed in the presence of a Notary Public, Peggy Ann Ford. Yet, neither Mr. Montero or Ms. Ford was called to testify by plaintiff.

There is other evidence that argues against the existence of the claimed assignment. In a certified financial statement for 1980, prepared by Mr. Ketcham's Certified Public Accountant, William J. Sheehan, the Eagles Nest interest is reflected as belonging entirely to Mr. Ketcham and the debt to plaintiff of $1,000,000 is not shown as a liability. Certainly it must be assumed that Mr. Ketcham talked to the accountant in the course of the preparation of this statement and did not tell the accountant of the assignment, if it did exist, or of the liability to his former wife, if it did exist. This constitutes considerable evidence that neither the assignment or liability actually existed.

Mr. Ketcham's 1987 and 1988 income tax returns, each signed under penalty of perjury, show his receipt of substantial amounts of interest from Eagles Nest via Western Title, which he apparently received as ultimate proceeds of the enterprise and retained and reported as his own income. No evidence was offered to show that he paid or accounted for any of this money to Mrs. Ketcham as would have been required had there been an assignment in existence.

No further details of the text of the claimed 1978 assignment were brought forward during the hearing.

There is, however, some written evidence that the assignment took place. This evidence is contained in a notation written by Mr. Ketcham across the face of an invoice of a company known as Colorand Corporation. The notation reads as follows:

To Evelyn Ketcham 9/22/81

This is the invoice for improvements to unit 129 which together w. the unit represents the first payment to you on the past due 1 MM loan. I have assigned Josh's note to you on June 21, 1981, and *all additional proceeds received from Eagles Nest.* Hopefully this will keep you from being a "Bag Lady." (emphasis supplied)

s/Chas. J. Ketcham

This perhaps self-serving (at this stage of the case) statement produced by Mr. Ketcham is certainly suspect. It is scant evidence of the claimed 1978 assignment, but it is some evidence that such an assignment did occur. The Government has not seriously challenged the authenticity of the notation or that it was written in 1981. The notation does support the claim of the 1978 assignment or at least of some such assignment prior to 1985.

Mr. Ketcham testified that he told Mr. Furbush of this assignment in 1980 at the time the Valley Bank loans for Eagles Nest were negotiated. However, Mr. Furbush did not recall any such conversation. He testified that had he known of such an assignment of the ultimate proceeds of Eagles Nest to Mr. Ketcham's former wife, it would have necessitated further inquiry as to the nature of the assignment and a concern as to whether the bank was obtaining a first lien in connection with its loan.

One must conclude that a banker making a loan in a sum substantially in excess of one million dollars would have been highly concerned about an assignment of any sort of an interest in connection with the Eagles Nest partnership to a third person who did not join in conveying the security to the bank. Since there is no evidence Mrs. Ketcham participated in any way in the conveyances which occurred in connection with the Valley Bank loans in 1980, we must conclude that Mr. Ketcham did not tell Mr. Furbush about the 1978 assignment.

In fact Mr. Ketcham testified that he never disclosed the 1978 assignment or recorded it because he didn't want to clutter things up and cloud the title to the Eagles Nest property which would make it more difficult to get a take out-loan (from the construction loan for the condominiums).

Mr. Ketcham wanted to be able to deal with the Eagles Nest property entirely as his own, without having to involve plaintiff in any way, and without disclosing to anyone else that such an assignment existed. Mr. Ketcham treated the Eagles Nest property and its ultimate proceeds as his sole property. Any assignment which existed was kept entirely secret from all but possibly plaintiff.

We must conclude that if the 1978 assignment was made, it was kept as a matter entirely in the confidence of the Ketchams and no one else knew about it until long after the I.R.S. tax lien was recorded in 1985.

The testimony of Mr. Ketcham as to the assignment is corroborated by the notation on the Colorand invoice. As mentioned above, the authenticity of the notation and the time when it was written were not seriously challenged by the Government. It is indeed scant evidence, but it is some evidence that the assignment did occur.

Once it is accepted that this notation of the assignment was made in 1981, then it becomes better evidence than the other evidence that is available which suggests that the assignment was never made. No matter what the other papers, such as the financial statement and tax returns say, no matter the fact of all the other conveniently missing documents, the better evidence is the notation of the assignment on the Colorand invoice.

Indeed, if the notation on the invoice was faked or forged at a later date, then why wouldn't parties as clever and intelligent as these have drawn up and predated a real, comprehensive agreement which without question would have been evidence of the 1978 assignment?

Thus, the scales are tipped slightly in favor of plaintiff. The preponderance of the evidence is that the 1978 assignment did take place and that the ultimate proceeds to be realized by Mr. Ketcham from the Eagles Nest were assigned at least as

between the Ketchams to plaintiff before the tax lien was filed.

Before proceeding further, we must flesh out the essential facts which are pertinent to our disposition of the case. The Eagles Nest condominium project was apparently in the process of construction in the period 1978 to 1980. The construction loan had been obtained from Wells Fargo Bank and a take-out loan was needed because Wells Fargo Bank refused to release individual condominiums as they were sold. Mr. Ketcham contacted Valley Bank in 1980 and in behalf of the partnership was able to obtain two take-out loans in the amount of $600,000 in August of 1980, and an additional $600,000 in October of 1980. These loans were secured by deeds of trust on a total of thirty condominium units.

On November 2, 1984, the I.R.S. made a deficiency income tax assessment on Mr. Ketcham for the year 1979 in the amount of $448,000. This debt had grown to approximately $1,500,000 by 1990. Mr. Ketcham must be taken to have known at the time of the assessment of this very large claim against him by a formidable creditor which was likely to take steps to collect.

As noted above, the notice of federal tax lien was recorded for the year 1979, on September 30, 1985. The Ketchams claim they had no knowledge of the recording of the lien.

There was an investigation by the Nevada Gaming Control Board in 1988 and 1989 which tangentially concerned the 1978 assignment. A letter was written by Mr. Ketcham to the Board in 1988 which described the $1,000,000 loan and the 1988 payment, but did not mention the 1978 assignment. In 1989 Mr. Ketcham testified before the Board as to these transactions and did testify about the 1978 assignment. This evidence on balance adds little to the proof as to whether such an assignment actually occurred. Why the assignment was mentioned in the testimony, but not in the letter is unexplained. Mention of the assignment in the testimony may have reflected the truth of the matter, but by that time with this large amount of taxes owing

for approximately six years a plan could have well been afoot to claim an assignment which predated the filing of the tax lien.

At least a sufficient number of condominiums were sold and collected for in the 1980–1988 period to eventually pay off the Valley Bank loan. Western Title had been collecting the payments made by the purchasers of the condominiums and remitting them to the bank for payment on the 1980 Valley Bank take-out loans. When the loans had been fully paid the bank assigned its interest in the remaining notes and deeds of trust executed by the condominium purchasers to Eagles Nest Limited Partnership. As soon as these assignments were recorded Mr. Ketcham as general (and only) partner of the partnership conveyed these notes and deeds of trust to plaintiff (and jointly to their son apparently because of the ill health of plaintiff, but nevertheless for her benefit) purportedly as additional payment on account of the original 1978 assignment and the underlying $1,000,000 loan. It should be noted that the Eagles Nest Limited Partnership was dissolved on December 3, 1980. However, the bank reconveyed the notes and deeds of trust to the original borrower, the partnership.

After the interests in the notes and deeds of trust were assigned in favor of plaintiff, Western Title, the collection agent, began to remit the payments to plaintiff. This continued until the levy by the I.R.S. was served on Western Title on May 16, 1990. After that the payments, as received by Western Title, were presumably remitted to the I.R.S.

## II. PRIORITY OF RIGHTS IN THE DEEDS OF TRUST

Based on the evidence presented at the hearing, we assume for the purposes of this motion that the 1978 assignment did in fact occur. We must next address the question as to whether this assignment which the court concludes was kept a secret between the Ketchams, at least until after the notice of tax lien was filed in

1985, is valid against a creditor of Mr. Ketcham, such as the I.R.S.

■ A tax lien reaches "all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321. Thus, we must first determine "whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach." *Aquilino v. United States*, 363 U.S. 509, 512, 80 S.Ct. 1277, 1279, 4 L.Ed.2d 1365 (1960). The taxpayer's property interest is a question of state law. *Id.* at 512–13, 80 S.Ct. at 1279–80; *Schmit v. United States*, 896 F.2d 352, 353 (9th Cir.1989).

Based on the hearing, we have concluded that in 1978 Mr. Ketcham assigned his interest in the Eagles Nest Limited Partnership to Mrs. Ketcham as partial payment of the loan. Under Nevada law, this partnership interest is personal property. N.R.S. § 88.528. This interest is assignable, but the assignee does not receive the rights of a partner. Instead, the assignee receives the right to any distribution to which the assignor would be entitled. N.R.S. § 88.-530. Thus, the notation of the assignment on the Colorand invoice, which describes Mrs. Ketcham's right to "all additional proceeds received from Eagles Nest," is consistent, under Nevada law, with an assignment of Mr. Ketcham's partnership interest.

We also view the later assignments of the deeds of trust as consistent with this intent. After the bank reconveyed the deeds of trust to the Eagles Nest Limited Partnership, dissolved since 1980, Mr. Ketcham, as general partner of the dissolved partnership, directly assigned them to Mrs. Ketcham, because she had the right to the distribution. Government's Exhibit 9.

We do not view this assignment as the creation of a security interest under the U.C.C. as adopted in Nevada. There is every indication that the assignment was made, not to *secure* payment, but *as* payment of Mr. Ketcham's debt to Mrs. Ketcham. *See, e.g., Lyon v. Ty–Wood Corp.*, 212 Pa.Super. 69, 239 A.2d 819 (1968) (assignments were absolute, in payment of pre-existing debt, and not for security); *Spurlin v. Sloan*, 368 S.W.2d 314 (Ky.1963) (assignment by one partner to others, in payment of debt, of right to distribution, was absolute assignment, and not security interest). Accordingly, it is an absolute assignment.

Furthermore, under Nevada law, reduction of the antecedent debt provides sufficient consideration for this assignment. N.R.S. § 112.040; *Board of Trustees v. Durable Developers, Inc.*, 102 Nev. 401, 724 P.2d 736, 744–47 (1986).

Therefore, we are faced with an absolute assignment of a partnership interest in exchange for sufficient consideration. However, we must also determine whether perfection was necessary under Nevada law. If perfection was necessary, then because the assignment was unperfected, Mr. Ketcham might have retained sufficient property rights in his partnership interest for a creditor to reach, even if the transaction is an absolute assignment. *See, e.g., Nevada Rock and Sand Co. v. United States*, 376 F.Supp. 161 (D.Nev.1974).

However, perfection of this assignment was not necessary. This assignment is outside the scope of Article Nine of the U.C.C., N.R.S. §§ 104.901–104.9507. Article Nine, which governs perfection, applies to "any transaction ... intended to create a security interest," N.R.S. § 104.9102(1)(a), and to "any sale of accounts or chattel paper." N.R.S. § 104.9102(1)(b). As discussed above, this transaction was not intended to create a security interest. Nor does this appear to be a sale of an account. "Account" is defined to include any right to payment for goods sold or leased or for services rendered. N.R.S. § 104.9106(1). This was a sale of a partnership interest, not an account. Even if it could be characterized as Mr. Ketcham's "account" with the Eagles Nest Limited Partnership, it would be the transfer of a single account in partial satisfaction of a preexisting indebtedness, and hence excluded by N.R.S. § 104.9104(6). *See Durable Developers*, 724 P.2d at 745–46.

Therefore, because this assignment of the partnership interest was outside the

scope of Article Nine, and perfection by filing was unnecessary, Mr. Ketcham did not retain any interest in the property. This lack of the need for perfection is what distinguishes this case from those in which the taxpayer was found to retain sufficient property rights, despite an assignment. *See, e.g., Valley Bank of Nevada v. City of Henderson,* 528 F.Supp. 907 (D.Nev.1981) (security interest was within Article Nine, hence filing necessary for priority over tax lien); *Nevada Rock & Sand,* 376 F.Supp. at 170–71 (whether viewed as security interest or sale of account, transaction was within Article Nine; hence filing was necessary for priority over tax lien). Indeed, where an absolute assignment for an antecedent debt is outside of the scope of Article Nine, the Nevada Supreme Court has held that the taxpayer no longer retains any property interest for a lien to reach. *See Durable Developers,* 724 P.2d at 744–47.

This is consistent with the federal law governing priority. Although state law determines the taxpayer's interest, federal law determines the priority between the competing interests. *Aquilino,* 363 U.S. at 514, 80 S.Ct. at 1280.

■ According to federal law, since the antecedent debt is sufficient consideration under Nevada law, Mrs. Ketcham paid "adequate and full consideration in money or money's worth" for the partnership interest. 26 U.S.C. § 6323(h)(6); 26 C.F.R. §§ 301.6323(h)–1(f)(3), 301.6323(h)–1(a)(3) (past consideration is money or money's worth if sufficient under local law). Furthermore, since the assignment is outside the scope of Article Nine, filing is not necessary under Nevada law. Thus, she acquired an interest that "is valid under local law against subsequent purchasers without actual notice." 26 U.S.C. § 6323(h)(6). Therefore, she is a "purchaser," as that term is used in section 6323, and is entitled to priority over the tax lien because she became a "purchaser" before the tax lien was filed. 26 U.S.C. § 6323(a); *Newnham v. United States,* 813 F.2d 1384, 1385 (9th Cir.1987).

## III. IRREPARABLE INJURY TO RIGHTS IN PROPERTY

### A. Under 26 U.S.C. § 7426

■ The Government contends that even if the 1978 assignment is valid, this court does not have authority to grant an injunction because the provisions of 26 U.S.C. § 7426(b)(1) permit an injunction to be issued only if a levy would "irreparably injure rights in property which the court determines to be superior to the rights of the United States in such property ..." The Government argues that injury to "rights in property," as used in the statute, refers to the property levied upon. The Government contends that the levy will not result in any irreparable injury to the rights of plaintiff in the levied property.

On the other hand, plaintiff argues that "rights in property" as used in the statute must be read more broadly to include loss of rights in *other* property owned by a person in the situation of plaintiff, such as her interest in one of the Hawaiian condominiums she owns. Plaintiff claims she will be forced to sell her other property to subsist unless the levy is lifted, because she has no other income, means, or ability to meet the necessities of life. Testimony of plaintiff's daughters and son at the hearing supports this contention.

Plaintiff's reading of the statute, though ingenious, is strained. The protection in the injunction provision of the statute for the rights of a third person in property appears to relate to rights in the property levied upon, rather than other property owned by a claimant such as plaintiff. According to the statute, the required irreparable injury must be to a claimant's rights in property which the court determines to be superior to "the rights of the United States in *such* property" (emphasis supplied). The statute speaks in terms of a "levy" which must be taken to refer to a levy on the property in which the United States claims an interest. The rights of a claimant which may be lost through the levy must be in the property in which the United States has claimed rights, thus the property levied upon.

The legislative history of section 7426 supports this reading of the statute. The senate report makes clear that the irreparable injury must be to the rights in the property levied upon. The report provides, "Injunctive relief is limited to cases where the court determines the Government's action is wrongful and, if completed, would irreparably injure the rights of another in *the* property...." S.Rep. No. 1708, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin.News 3722, 3751 (emphasis added).

We conclude that if section 7426(b)(1) governs the issue of irreparable injury to the exclusion of other tests of irreparable injury, plaintiff cannot prevail in her motion for preliminary injunction. She cannot claim that the levy will irreparably injure her rights in the property levied upon, because her interest in the property will not be irreparably lost.

If entitled, she can eventually obtain the return of the property under section 7426(b)(2)(A). She can also recover any money the Government has received from payments on the notes under section 7426(b)(2)(B). If the Government sells the notes, she can recover their value under section 7426(b)(2)(C).

Also, the Government proposes that the proceeds being collected on the Eagles Nest notes and deeds of trust be placed in escrow pending the outcome of this case, in lieu of issuance of an injunction and pending a final decision on the merits. However, because we find that if plaintiff's wrongful levy claim is meritorious, her remedies, as discussed above, will be adequate, placing the notes in escrow is unnecessary.

Therefore, plaintiff is protected from any *irreparable* injury to her rights in this property.

### B. Under Ordinary Injunction Test

Plaintiff argues that the normal rules of injunction in the Ninth Circuit apply, rather than merely the rule of 26 U.S.C. § 7426(b)(1), and that the normal injunction standards would merit the issuance of an injunction. Ordinarily, "[t]o obtain a pre-liminary injunction, a party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor." *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1448 (9th Cir. 1988) (quoting *Apple Computer, Inc. v. Formula Int'l, Inc.,* 725 F.2d 521, 523 (9th Cir.1984). It is likely that plaintiff could at least satisfy the branch of the test requiring serious questions going to the merits and the balance of hardships tipping in her favor.

However, the ordinary standards for a preliminary injunction do not apply here. Although "[d]istrict courts are ordinarily given wide discretion in granting or denying preliminary injunctions under Fed. R.Civ.P. 65(a) ... [i]n the context of suits attempting to restrain the collection of taxes, this discretion is limited by the general policy which disfavors enjoining the taxing authority. *See* 26 U.S.C. § 7421(a) (anti-injunction statute)...." *Al–Kim, Inc. v. United States,* 650 F.2d 944, 948 (9th Cir. 1979) (citations omitted). More specifically, section 7421, the anti-injunction statute, explicitly prohibits injunctions in these cases except as provided in specific sections, including section 7426. 26 U.S.C. § 7421. Thus, the ordinary standards for an injunction do not apply here.

### C. Under Other Explicit Exceptions and the Equitable Exception to the Anti-Injunction Statute

However, under other explicit exceptions to the anti-injunction statute, deprivation of the ability to provide the necessities of life constitutes irreparable harm and hence equitable grounds for an injunction. For example, in *Jensen v. I.R.S.,* 835 F.2d 196, 198 (9th Cir.1987), the taxpayer alleged that the I.R.S. failed to comply with the notice provisions of 26 U.S.C. §§ 6212(a) and 6213(a). Like section 7426, sections 6212(a) and 6213(a) are specifically excepted from the anti-injunction statute. However, these sections, unlike section 7426, do not attempt to limit the types of irreparable harm for which injunctions can be issued to

prevent. Thus, the Government contends that deprivation of the necessities of life does not constitute irreparable harm for purposes of section 7426.

We agree. We cannot regard the requirement in section 7426 of irreparable injury "to rights in property" as accidental. Whatever the requirements for injunctions in the other explicit exceptions to the anti-injunction statute, section 7426 clearly requires irreparable injury to rights in the property.

There is also a judicially created exception to the anti-injunction statute. Under what has been called the *"Williams Packing"* exception, the literal terms of section 7421 can be avoided where there is a showing of (1) irreparable injury and (2) certainty of success on the merits. *Bob Jones University v. Simon,* 416 U.S. 725, 737, 94 S.Ct. 2038, 2046, 40 L.Ed.2d 496 (1974) (citing *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962)). Under this exception, deprivation of the ability to provide the necessities of life would ordinarily constitute an irreparable injury by the reasoning of *Jensen.*

As discussed above, we have determined that plaintiff has a strong likelihood of success on the merits, at least based on the evidence in front of us. However, we do not think this judicially created exception can apply to avoid the express language of section 7426, which requires irreparable harm to rights in the property.

Instead, we read section 7426, providing for injunctions in wrongful levy actions, as requiring irreparable injury to a plaintiff's rights in the property levied upon. This requirement applies to the preliminary injunction sought in this case. Therefore, because plaintiff cannot demonstrate any possibility of irreparable injury to her rights in this property, a preliminary injunction should not be issued.

NOW, THEREFORE, IT IS HEREBY ORDERED that plaintiff's motion for a preliminary injunction is DENIED.